**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

BRIAN RICHARDSON,

    *Plaintiff,*

  v.              Civil Action No.:

MAXIMUS, INC.,

    *Defendant.*

## COMPLAINT

Plaintiff Brian Richardson ("Mr. Richardson", or "Plaintiff"), by and through undersigned counsel, for his Complaint against Defendant, MAXIMUS, Inc. ("MAXIMUS", or "Defendant"), alleges as follows:

1. This action is brought by Plaintiff for damages against Defendant for discrimination on the basis of race and sex, hostile work environment, and retaliation for Plaintiff's prior protected activity in violation of: (i) Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"); (ii) the Civil Rights of 1866, 42 U.S.C. § 1981 ("Section 1981"); and the Virginia Human Rights Act ("VHRA"), Code of Virginia §2.2-3900, *et seq*.

## JURISDICTION AND VENUE

2. This Court has original jurisdiction over Plaintiff's Section 1981 and Title VII claims pursuant to 28 U.S.C. § 1331 because those claims arise under the United States Constitution and laws of the United States.

3. Additionally, this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the pendent state law claims under the VHRA because those state law claims arise out of the same nucleus of operative fact as the Section 1981 and Title VII claims.

4.      This Court has jurisdiction over Defendant because, upon information and belief, it is a citizen of the United States, has sufficient minimum contacts in Virginia, or otherwise intentionally availed itself of the Virginia market so as to render the exercise of jurisdiction over it by the Federal and Virginia courts consistent with traditional notions of fair play and substantial justice.

5.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because all of the events, acts, and/or omissions giving rise to Plaintiff's claims occurred in the Commonwealth of Virginia. Specifically, Plaintiff was employed by Defendant at a location in this judicial district; Plaintiff's employment records are located and maintained by Maximus in this judicial district; and the unlawful employment practices and decisions adverse to Plaintiff's employment which are the basis of this civil action took place in this judicial district.

<u>**PARTIES**</u>

6.      Brian Richardson is a citizen of the United States who currently resides in Upper Marlboro, Maryland. Plaintiff submits himself to the jurisdiction of the United States District Court for the Eastern District of Virginia for any and all purposes related to or arising from the action within.

7.      At all times relevant to the facts alleged in this lawsuit, Plaintiff was employed by Defendant.

8.      Defendant, MAXIMUS, Inc., conducts business operations from its main headquarters located at 1891 Metro Center Drive, Reston, Virginia 20190.

9.      During all times relevant to this action, Defendant met the jurisdictional prerequisites for a claim under Title VII.

10.    Defendant, including its supervising personnel, officials, agents, officers, and employees were responsible for all acts complained of herein.

## ADMINISTRATIVE PROCESS

11.    Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on July 21, 2021.

12.    After more than 180 days, the EEOC issued Plaintiff a Notice of Right to Sue on April 7, 2022. *See* Exhibit A.

13.    Plaintiff's suit is timely filed with this Court.

## FACTUAL ALLEGATIONS

14.    Plaintiff joined Defendant MAXIMUS on December 15, 2019, as the Vice President of Business Development for the Civilian/DoD portfolio.

15.    In this role, Mr. Richardson (Black, male) led a team of four employees and three contractors to evaluate opportunities and develop strategies for winning work within governmental agencies throughout the United States and abroad.

16.    During his short tenure with Defendant, Plaintiff won three lucrative business opportunities for the company, securing billions of dollars in revenue over the next 5 years.

17.    However, shortly after joining Defendant's organization, Mr. Richardson experienced both explicit racism, discrimination based on his sexual orientation, retaliation and microaggressions from his co-worker and Senior Vice President of Civilian Division and Federal Services, Harry Sundberg (White, male).

18.    For example, Mr. Sundberg would regularly "confuse" the two African American employees on the team, Plaintiff and Rowland Scott, despite the fact that Plaintiff is 6'4 and in his early forties at the time and Mr. Scott was an older gentleman in his sixties and almost a foot

shorter. Yet, Mr. Sundberg had no difficulty remembering the names of Defendant's White employees, including several new hires.

19.    While Plaintiff made efforts to address and correct this problem with Mr. Sundberg numerous times via conference call, email, text, instant message, and in supervised meetings with Plaintiff's supervisor, nothing changed.

20.    Mr. Sundberg's racism was also on numerous occasions more explicit. For example, Plaintiff was advised by two employees that during a small team meeting, Mr. Sundberg used the "n-word" and commented "that boy needs to learn his place" when referring to Plaintiff. When Plaintiff confronted Mr. Sundberg about the meaning behind these comments, Mr. Sundberg feigned ignorance.

21.    Mr. Sundberg also on multiple occasions referred to African Americans as "you people" and called Mr. Richardson's college fraternity a "gang" in front of Mr. Richardson's boss and front-line supervisor, Senior Vice President of Sales, Allison Patrick (White, female).

22.    When Plaintiff challenged Mr. Sundberg about his aggressive behavior, he called Mr. Richardson too sensitive and too "girly", implying these were insults, and told him he was weak and a "mamby-pamby." The term "namby-pamby" is an adjective meaning (1) lacking in character or substance, insipid or (2) weak, indecisive.

23.    When Plaintiff spoke with black female employees and coworkers, it was confirmed that Mr. Sundberg treated black female staff with equal contempt. For example, Mr. Sundberg singled out Ms. Leslie Willoughby (black, female) and insisted that she was forbidden to speak to her former colleagues as she "runs amok". This treatment continued as Mr. Sundberg indicated to Mr. Richardson and his colleagues that Ms. Willoughby was not knowledgeable enough to meet with her former colleagues at the Department of Education; therefore, Mr.

Sundberg and his white counterparts (Bob Santos and Dough Tinder) participated in these meetings while intentionally excluding Ms. Willoughby and Mr. Richardson from meetings with the customer.

24.     On another occasion, Mr. Sundberg made comments about the black Department of Education staff, including that they were "incompetent" and placeholders within the department.

25.     On several occasions, Mr. Sundberg made comments about Plaintiff's sexuality, insinuating that he was gay and that there was something "wrong" with him because he was not married. Mr. Sundberg stated that people over 30 who are not married are either crazy or gay.

26.     On February 5, 2020, Plaintiff alerted Ms. Patrick of the racist comments, aggressive behavior, and harassment. During this initial conversation, Ms. Patrick notified Plaintiff of the incident in which Mr. Sundberg had accused him of being in a "gang" due to his fraternity affiliation.[1]

27.     On or about March 2, 2020, Ms. Patrick and Plaintiff met for lunch at the Annapolis Marina to discuss Mr. Sundberg's racist comments, hostile and aggressive behavior, and the effects that Plaintiff and his team were experiencing as a result. In response, Ms. Patrick encouraged Plaintiff to begin taping his conversations with Mr. Sundberg.

28.     Following Ms. Patrick's suggestion, Plaintiff confronted Mr. Sundberg on four separate occasions (February 23, March 16, April 7, and April 21, 2021) about his comments and how they made Plaintiff feel to which Mr. Sundberg feigned ignorance.

29.     Plaintiff also reported Mr. Sundberg's behavior to his Senior Consultant, Vic Romita, and HR Representative, Anne Keter, on two (2) occasions, which were acknowledged in Plaintiff's exit interview.

---

[1] Ms. Patrick later acknowledged this accusation during a call with Plaintiff.

30. Throughout his employment, Plaintiff reported continued discrimination and harassment at least fifteen (15) additional times to Human Resources, Plaintiff's supervisor Allison Patrick, Denise Moscatelli (Sr. VP, Capture), Stephanie Crawford (EA for GM), Vic Romita Sr. (Consultant). Additionally, Mr. Sundberg subjected Mr. Richardson to a hostile work environment in front of Maximus leadership, including Ms. Patrick, Reggie Turner, Leslie Willoughby, Jay Murray, "Casandra", "Gary", Gina Bornarth, and several others.

31. Mr. Sundberg made Plaintiff's work environment uncomfortable and unwelcome with his continued behavior and harassment.

32. Mr. Sundberg's actions escalated beyond words over the last year of Plaintiff's employment, as Mr. Sundberg made concerted efforts to get rid of Plaintiff.

33. On numerous occasions, Mr. Sundberg complained to Ms. Patrick (Plaintiff's supervisor) about Plaintiff's performance with false allegations.

34. For example, Mr. Sundberg would repeatedly complain of Plaintiff's handling of a weekly call between the teams that Plaintiff led. Due to the disruption of these unfounded complaints, Ms. Patrick finally took over the lead. She conducted the meeting in the exact same format that Mr. Richardson did and read verbatim the script that Mr. Richardson prepared. In response, Mr. Sundberg told her that it was an "amazing meeting."

35. Mr. Sundberg belittled Mr. Richardson with continued aggression and negative comments towards Plaintiff's performance and accomplishments in front of their peers, subordinates, direct reports, and consultants, impacting their treatment of Plaintiff and damaging Plaintiff's ability to effectively manage and achieve success. This negatively impacted the team's ability to work together to accomplish the goals of the company.

36.    However, as stated above, Mr. Sundberg's exclusion of Ms. Willoughby and Plaintiff from meetings with customers directly impacted their ability to be successful in their team. Mr. Sundberg was the agent in constant miscommunication within the team, as he continuously "forgot" to include Plaintiff and Ms. Willoughby in meetings. Plaintiff and Ms. Willoughby would only become aware of these meetings through "water cooler talk" or comments made in staff meetings which prompted additional discussion and growing tension within the team.

37.    Further, due to Mr. Sundberg's interference, Plaintiff's team was reduced to only one (1) employee and two (2) consultants.

38.    On or about February 22, 2020, Mr. Sundberg again displayed aggressive behavior towards Plaintiff and proceeded to question Plaintiff's past work history and success, stating that he did not support Plaintiff's direction in front of Plaintiff's team. This came as a shock to Plaintiff as he had previously briefed Mr. Sundberg with a subset of the team about his strategy moving forward—Mr. Sundberg had expressed not only that he supported the strategy, but that he was thankful for all the hard work Plaintiff and the others were doing. This led many on Plaintiff's team to reach out to offer Plaintiff sympathy.

39.    Mr. Sundberg's pattern of behavior became so pervasive that one of Plaintiff's employees William "Jay" Murray (Sr. Director) filed a hostile work environment due to racism, aggressive behavior, inappropriate comments, and fear for his job. This employee demanded to be moved from contact with Mr. Sundberg after making several complaints with no change in behavior from Mr. Sundberg. This employee actively participated in the ensuing investigation.

40.    Nevertheless, Mr. Sundberg's actions negatively impacted certain areas of Plaintiff's performance. Mr. Sundberg intentionally excluded Mr. Richardson and Ms. Willoughby

from Federal Student Aid (FSA) business development meetings, which had a direct influence on the overall strategy for procurement and $2.8 billion in potential revenue.

41.    Upon learning of the option to contact the Ethics hotline, Plaintiff did so and made a complaint along with another anonymous coworker. Sheryl Knutson, a Senior Specialist with the Corporate Ethics & Compliance team for Defendant, confirmed receipt of this report via email correspondence to Plaintiff.

42.    Plaintiff took appropriate steps to put Defendant on notice of the hostile work environment.

43.    After enduring this treatment for over a year with no intervention from upper management, Plaintiff again reached out to Human Resources for Defendant.

44.    Unbeknownst to Plaintiff, after Plaintiff informed the Senior Vice President of Capture, Denise Moscatelli (White, female), of the hostile work environment Mr. Sundberg subjected him to, Ms. Moscatelli leaked information regarding Plaintiff's HR complaint to Mr. Sundberg. This information was disclosed to Mr. Sundberg without authorization from Plaintiff.

45.    Due to Ms. Moscatelli's actions, Mr. Sundberg became enraged. Mr. Sundberg called Plaintiff and threatened him, stating that if Mr. Richardson did not drop his HR grievance that it was going to be difficult for him to be successful.  Mr. Richardson did not withdraw the grievance.

46.    Mr. Sundberg then reached out to a recruiter and told them that Plaintiff was looking for a new job. Mr. Sundberg provided the recruiter with Mr. Richardson's *work email and personal* contact information. Mr. Sundberg then informed others working for Defendant that Plaintiff was looking for new employment, which prompted them to send recruiters his way and further damaged Mr. Richardson's relationships with his peers. Mr. Richardson immediately

notified HR, along with Ms. Moscatelli who was acting for Ms. Patrick, of Mr. Sundberg's threats regarding Plaintiff's job being in jeopardy.

47.    Mr. Richardson notified HR, Ms. Moscatelli (SVP) and Tom Romeo, the General Manager of U.S. Federal Services Segment, when he began receiving emails from three separate recruiters–all three recruiters acknowledged via email that Mr. Sundberg asked them to reach out to Plaintiff, because Mr. Sundberg advised them that Plaintiff was looking for employment opportunities. At the time, Mr. Richardson had no intention of leaving his position with Defendant, and he never had any conversations with Mr. Sundberg regarding his career path.

48.    Mr. Richardson again made it clear to his supervisor, Ms. Patrick, on multiple occasions over the last year of his tenure that this treatment was ongoing and unwelcomed. Ms. Patrick acknowledged in phone conversations, emails, instant messages, and text messages that she observed the aggression and bad behavior, and that the behavior was inappropriate, but failed to take any steps to protect Plaintiff from the ongoing abuse.

49.    Even when Mr. Richardson took matters into his own hands by reaching out to HR, their response was slow and disappointing. For weeks after filing his HR grievance, Mr. Richardson was still expected to endure Mr. Sundberg's racist and homophobic behavior to do the job he was hired to perform. No protections were put in place by management to protect Plaintiff from further discrimination despite having knowledge of Mr. Richardson's complaint.

50.    At this time, HR had acknowledged Plaintiff's email and confirmed their follow-up call but given that the complaint involved higher level individuals, a separate group within HR would need to contact him. No investigator was ever assigned nor was an investigation even conducted by HR prior to Plaintiff engaging the hotline. Shortly after, Mr. Sundberg was removed

from the team. However, this was only after the *White* employees began making complaints against him[2].

51.     Furthermore, Plaintiff was subjected to retaliation due to his ongoing complaints.

52.     While Defendant later claimed that it did not subject Mr. Richardson to any action, adverse or otherwise, as a result of his race, sexual orientation, allegations made on his behalf, or participation in the investigation. This is absolutely false. While HR indicated that Mr. Richardson and Mr. Sundberg were not to have any contact, Mr. Richardson was still forced to interact with Mr. Sundberg via Zoom meetings, emails, and conference calls on a daily basis. This consistent direct contact occurred up until Mr. Richardson's last day with the company. In fact, while Mr. Sundberg was moved away from Plaintiff, Mr. Sundberg repeatedly join meetings in which Plaintiff was present and go out of his way to interact with Plaintiff with the intent of antagonizing Plaintiff.

53.     Moreover, to accomplish a *partial* separation of Mr. Sundberg and Mr. Richardson, Defendant elevated Mr. Sundberg to a position with greater responsibility,  that of Special Assistant to the CEO (Bruce Caswell), a C-suite position which means he was part of the high-ranking executive titles in Defendant's organization. In contrast, Mr. Richardson had his large contracts taken away and given to Mike Owens (White, male).

54.     On Monday, May 10, 2021, Plaintiff's most lucrative accounts, such as FSA, were taken away from him and given to Mike Owens (white, male). In exchange, Mr. Richardson was given a less lucrative portfolio to manage.

---

[2] Mr. Sundberg's hostile actions an employee, William "Jay" Murray (Director of Civilian DoD), to file a hostile work environment complaint after witnessing the treatment Mr. Sundberg put Plaintiff through and his own fear to disclose that he had a wife of Hispanic origin for fear of retaliation. Unlike Mr. Richardson, this employee was promptly moved.

55.    While Defendant contends that this change in account management Plaintiff experienced was solely the result of ongoing company reorganization–this is simply not the truth. The change *would* have made sense if Mr. Owens and Plaintiff were not directly realigned with the same P&L owner.

56.    Ms. Patrick first advised of the change after Plaintiff received a spreadsheet of the realignment. Defendant claimed that they were realigning business units as a result of Mr. Sundberg's move and that in order to move forward, Mr. Sundberg's work needed to be divided. As such, Plaintiff's portfolio—the largest of the team—was split between two (2) Profit & Loss (P&L) leaders. While Plaintiff and Mr. Owens were *both* placed on the same team, Plaintiff's work was given to Mr. Owens. At the time of this transfer, Mr. Owens had been working for Defendant roughly six (6) months before Plaintiff, but in the capacity of a Director. Mr. Owens had been promoted after Plaintiff joined, but Plaintiff's sales were greater.

57.    More specifically, Mr. Owens had no tangible experience in the education space and no sales.

58.    Before this supposed reorganization, under Plaintiff's direction, Defendant was awarded one of its largest indefinite delivery, indefinite quantity (IDIQ) contracts, the NextGen BPO, worth over $1.8 billion under the Department of Education. Plaintiff also led the negotiation efforts to directly acquire Navient resources, the largest student loan debt consolidator. The deal, finalized on October 20, 2021, was worth over $150M. OPM was also an account Plaintiff had great success winning a $17.6M contract.

59.    Plaintiff spent significant time and effort in procuring these lucrative contracts for Defendant. Despite the success and revenue Plaintiff brought in for Defendant, all of these accounts were given to Mr. Owens.

60.     Given the facts above, there was no reasonable or logical reason to transfer these accounts to Mr. Owens.

61.     Although Plaintiff remained in his existing title, Plaintiff was given a clear demotion.

62.     Reassigning Plaintiff greatly impacted both his bonus potential for the year and growth potential within the company.

63.     Furthermore, after Mr. Richardson's complaint was formally filed with HR, MAXIMUS stripped him of his Business Development (BD) Manager (Gina). Gina was moved prior to the supposed reorganization to a smaller team to support the IRS with Larry Reagan, VP, Finance (White, male).

64.     This "reorganization" sent a clear message to Mr. Richardson that he was not welcome at MAXIMUS.

65.     Due to the ongoing harassment and retaliation, Mr. Richardson took a leave of absence from July 12 until July 24, 2021.

66.     Ultimately, upon consideration of his situation, Plaintiff had no choice but to resign on July 26, 2021.

67.     Upon his exit from the company, Defendant took Plaintiff's vested stock options of over $10,000.

**COUNT I**
**42 U.S.C. § 2000(e)-2 TITLE VII – RACE DISCRIMINATION**
**AGAINST MAXIMUS, INC.**

68.     Plaintiff incorporates by reference each and every preceding paragraph, as though set forth fully herein.

69.     Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) makes it unlawful to discharge or otherwise discriminate against any individual based on sex with respect to compensation, terms, conditions, or privileges of employment.

70.     Defendant is and continues to be an "employer" within the meaning of Title VII.

71.     Plaintiff was an "employee" within the meaning of Title VII.

72.     Plaintiff is Black and a member of a protected class.

73.     During his tenure as Vice President of Business Development for the Civilian/DoD portfolio, Plaintiff was Defendant's only Black senior level management personnel supporting DoD and Civilian work.

74.     Defendant allowed his coworker, Mr. Sundberg, to continue to harass Plaintiff with explicit racism and microaggressions.

75.     Defendant allowed Mr. Sundberg to conduct these behaviors without repercussions, despite many complaints and attempts to address/correct Mr. Sundberg's behavior. These behaviors perpetrated by Mr. Sundberg included, but were not limited to:

a.  Regularly "confusing" Plaintiff and the only other African American employee on the team, Mr. Scott, despite their appearances being vastly different but showing far more respect to his (Mr. Sundberg's) employees by correctly identifying them.

b.  Using the "n-word" in a small team meeting and commenting "that boy [Plaintiff] needs to learn his place."

c.  Referring to African Americans as "you people."

d.  Calling Mr. Richardson's college fraternity a "gang" during conversation with Ms. Patrick, Plaintiff's boss.

13

e.   Making false allegations about Plaintiff's performance, particularly the weekly team calls Plaintiff led–while praising the same presentation and material when the meeting was conducted by a White employee.

f.   Intentionally excluding Plaintiff and Ms. Willoughby (Black, female) from FSA business development meetings–directly influencing the procurement strategy and impeding billions of potential revenue Plaintiff could have secured and negatively impacting Plaintiff's performance.

g.   Threatening to make Plaintiff's situation even worse if Plaintiff did not withdraw his HR complaint.

h.   Providing Plaintiff's contact information to recruiters and spreading rumors that Plaintiff was leaving Maximus.

i.   Reducing Plaintiff's team to only one (1) employee and two (2) consultants— the smallest team in the organization when taking into account Plaintiff overseeing the largest portfolio with the highest sales goals.

76.   When Plaintiff attempted to address these issues with Mr. Sundberg privately, primarily Mr. Sundberg's racist comments, aggressive behavior, and harassment, Mr. Sundberg again feigned ignorance and made no steps to change his behavior.

77.   Plaintiff followed Defendant's protocol by reporting the issues to his front-line supervisor (up the chain of command) Ms. Patrick in February and March of 2020.

78.   Plaintiff reported Mr. Sundberg's behavior to senior management and Human Resources for Defendant.

79.   Plaintiff reported continued discrimination and harassment at least fifteen (15) additional times.

80.     Defendant allowed Mr. Sundberg to continuously display aggression and make negative comments about Plaintiff in front of peers, direct reports, and consultants–damaging his ability to effectively manage and achieve success.

81.     Defendant allowed Mr. Sundberg to continue unchecked and made Plaintiff's work environment uncomfortable and unwelcome for any reasonable person.

82.     Defendant and their management staff refused to listen to or investigate Plaintiff's complaints of race discrimination.

83.     Plaintiff made requisite steps to remedy the situation by calling Defendant's Ethics hotline and making a complaint about the hostile work environment along with another anonymous coworker.

84.     Plaintiff reached out to Human Resources for Defendant to address these same concerns after no action was taken against Mr. Sundberg.

85.     Defendant violated Plaintiff's privacy by leaking information of his complaint to Mr. Sundberg and opening Plaintiff up to retaliation from Mr. Sundberg.

86.     Defendant ignored Plaintiff's request for support and/or investigation when dealing with Mr. Sundberg, and only intervened and removed Mr. Sundberg from the team when a *White* employee made a complaint.

87.     Defendant, under the guise of trying to remedy the situation and separate Mr. Sundberg from the team, promoted Mr. Sundberg to a more lucrative/higher position in a different team.

88.     Defendant further punished Plaintiff by taking away Plaintiff's most lucrative accounts and transferring them to a less qualified, White employee while giving Plaintiff a less lucrative portfolio to manage.

89.     In doing so, Defendant greatly impacted both Plaintiff's bonus potential for 2021 and growth potential within the company.

90.     Defendant's lack of action to address Plaintiff's race discrimination, harassment, and hostile work environment and their retaliation against Plaintiff gave Plaintiff no other choice but to resign from his position with Defendant.

91.     Defendant subject Plaintiff to adverse and different terms and conditions of employment than his White counterpart (Mr. Sundberg).

92.     As an actual and proximate cause of Defendant's conduct, Plaintiff has suffered physical injury, emotional distress, embarrassment, humiliation, and lost wages and benefits.

**COUNT II**
**42 U.S.C. § 2000(e)-2 TITLE VII – SEXUAL ORIENTATION DISCRIMINATION**
**AGAINST MAXIMUS, INC.**

93.     Plaintiff incorporates by reference each and every preceding paragraph, as though set forth fully herein.

94.     Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) makes it unlawful to discharge or otherwise discriminate against any individual based on sex with respect to compensation, terms, conditions, or privileges of employment.

95.     "Sex" discrimination also encompasses discrimination on the basis of sexual orientation and protects homosexual or gay employees. *Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731 (2020).

96.     Defendant is and continues to be an "employer" within the meaning of Title VII.

97.     Plaintiff was an "employee" within the meaning of Title VII.

16

98.     Plaintiff is a straight male, but subject to discrimination based on his assumed sexual orientation and treated as though he was a homosexual/gay male, a member of a protected class.

99.     Plaintiff satisfied his employer's reasonable expectations.

100.     On several occasions, Mr. Sundberg made comments about Plaintiff's sexuality, insinuating that he was gay and that there was something "wrong" with him because he was not married. Mr. Sundberg stated that only people over 30 not married are either crazy or gay. He called Plaintiff a "namby-pamby" and said he was girly and too sensitive.

101.     Plaintiff would often, after the fact, find out that Mr. Sundberg would ask around the office about Plaintiff's sexuality and was seen multiple times in Plaintiff's office without Plaintiff present looking at pictures to try and identify things about Plaintiff's personal life.

102.     When Plaintiff attempted to address these issues with Mr. Sundberg privately, primarily Mr. Sundberg's homophobic comments, aggressive behavior, and harassment, Mr. Sundberg again feigned ignorance and made no steps to change his behavior.

103.     Plaintiff followed Defendant's protocol by reporting the issues to his front-line supervisor (up the chain of command) Ms. Patrick in February and March of 2020.

104.     Plaintiff reported Mr. Sundberg's behavior to senior management and Human Resources for Defendant.

105.     Plaintiff reported continued discrimination and harassment at least fifteen (15) additional times.

106.     Defendant allowed Mr. Sundberg to continuously display aggression and make negative comments about Plaintiff in front of peers, direct reports, and consultants–damaging his ability to effectively manage and achieve success.

107.    Defendant allowed Mr. Sundberg to continue unchecked and made Plaintiff's work environment uncomfortable and unwelcome for any reasonable person.

108.    Defendant and their management staff refused to listen to or investigate Plaintiff's complaints of sexual orientation discrimination.

109.    Plaintiff made requisite steps to remedy the situation by calling Defendant's Ethics hotline and making a complaint about the hostile work environment.

110.    Plaintiff reached out to Human Resources for Defendant to address these same concerns after no action was taken against Mr. Sundberg.

111.    Defendant violated Plaintiff's privacy by leaking information of his complaint to Mr. Sundberg and opening Plaintiff up to retaliation from Mr. Sundberg.

112.    Defendant ignored Plaintiff's request for support and/or investigation when dealing with Mr. Sundberg, and only intervened and removed Mr. Sundberg from the team when a *White* employee made a complaint.

113.    Defendant, under the guise of trying to remedy the situation and separate Mr. Sundberg from the team, promoted Mr. Sundberg to a more lucrative/higher position in a different team.

114.    Defendant further punished Plaintiff by taking away Plaintiff's most lucrative accounts and transferring them to a less qualified, white employee while giving Plaintiff a less lucrative portfolio to manage.

115.    In doing so, Defendant greatly impacted both Plaintiff's bonus potential for 2021 and growth potential within the company.

116.    Defendant's lack of action to address Plaintiff's sexual orientation discrimination, harassment, and hostile work environment and their retaliation against Plaintiff gave Plaintiff no other choice but to resign from his position with Defendant.

117.    Defendant subject Plaintiff to adverse and different terms and conditions of employment than his white counterpart (Mr. Sundberg).

118.    As an actual and proximate cause of Defendant's conduct, Plaintiff has suffered physical injury, emotional distress, embarrassment, humiliation, and lost wages and benefits.

**COUNT III**
**42 U.S.C. § 2000(e)-3 TITLE VII – RETALIATION**
**AGAINST MAXIMUS, INC.**

119.    Plaintiff incorporates by reference each and every preceding paragraph, as if set forth fully herein.

120.    Plaintiff made complaints to Defendant and Defendant's management personnel regarding Mr. Sundberg's racist and homophobic comments, aggressive behavior, and continual harassment.

121.    Defendant and their management staff refused to listen to or investigate Plaintiff's complaints of race discrimination.

122.    Plaintiff made requisite steps to remedy the situation by calling Defendant's Ethics hotline and making a complaint about the hostile work environment.

123.    Plaintiff reached out to Human Resources for Defendant to address these same concerns after no action was taken against Mr. Sundberg.

124.    Defendant violated Plaintiff's privacy by leaking information of his complaint to Mr. Sundberg and opening Plaintiff up to retaliation from Mr. Sundberg.

125.    Defendant ignored Plaintiff's request for support and/or investigation when dealing with Mr. Sundberg, and only intervened and removed Mr. Sundberg from the team when a *white* employee made a complaint.

126.    Defendant promoted Mr. Sundberg to a more lucrative/higher position on a different team and, in turn, punished Plaintiff by taking away Plaintiff's most lucrative accounts and transferring them to a less qualified, white employee while giving Plaintiff a less lucrative portfolio to manage.

127.    Defendant greatly impacted both Plaintiff's bonus potential for 2021 and growth potential within the company.

128.    Defendant's lack of action to address Plaintiff's race discrimination, harassment, and hostile work environment and their retaliation against Plaintiff gave Plaintiff no other choice but to resign from his position with Defendant.

129.    As an actual and proximate cause of Defendant's conduct, Plaintiff has suffered emotional distress and lost wages and benefits.

130.    Plaintiff seeks nominal, compensatory, and punitive damages to compensate him for harm inflicted by Defendant. Plaintiff seeks back pay with pre and post judgment interest, front pay, reimbursement for lost benefits, compensation for emotional distress, and repayment of his attorneys' fees and litigation costs and expenses.

## COUNT IV
## 42 U.S.C. § 1981 - RACE DISCRIMINATION
## AGAINST MAXIMUS, INC.

131.    Plaintiff incorporates by reference each and every preceding paragraph, as though set forth fully herein.

132.    The Civil Rights Act of 1964 prohibits intentional race-based discrimination in contractual relationships, such as employment agreements.

133.    During and under the terms of Plaintiff's employment with Defendant, Plaintiff had a right to be protected from discrimination based on his race, African American.

134.    During his tenure as Vice President of Business Development for the Civilian/DoD portfolio, Plaintiff was Defendant's only Black senior level management personnel supporting DoD and Civilian work.

135.    Defendant allowed his coworker, Mr. Sundberg, to continue to harass Plaintiff with explicit racism and microaggressions.

136.    Defendant allowed Mr. Sundberg to conduct these behaviors without repercussions, despite many complaints and attempts to address/correct Mr. Sundberg's behavior. These behaviors perpetrated by Mr. Sundberg included, but were not limited to:

a.  Regularly "confusing" Plaintiff and the only other African American employee on the team, Mr. Scott, despite their appearances being vastly different but showing far more respect to his (Mr. Sundberg's) employees by correctly identifying them.

b.  Using the "n-word" in a small team meeting and commenting "that boy [Plaintiff] needs to learn his place".

c.  Referring to African Americans as "you people" and calling Mr. Richardson's college fraternity a "gang" during conversation with Ms. Patrick, Plaintiff's boss.

d.   Making false allegations about Plaintiff's performance, particularly the weekly team calls Plaintiff led–while praising the same presentation and material when the meeting was conducted by a White employee.

e.   Intentionally excluding Plaintiff and Ms. Willoughby (Black, female) from FSA business development meetings–directly influencing the procurement strategy and impeding billions of potential revenue Plaintiff could have secured and negatively impacting Plaintiff's performance.

f.   Threatening to make Plaintiff's situation even worse if Plaintiff did not withdraw his HR complaint.

g.   Providing Plaintiff's contact information to recruiters and spreading rumors that Plaintiff was leaving Maximus.

h.   Reducing Plaintiff's team to only one (1) employee and two (2) consultants.

137.   When Plaintiff attempted to address these issues with Mr. Sundberg privately, primarily Mr. Sundberg's racist comments, aggressive behavior, and harassment, Mr. Sundberg again feigned ignorance and made no steps to change his behavior.

138.   Plaintiff followed Defendant's protocol by reporting the issues to his front-line supervisor (up the chain of command) Ms. Patrick in February and March of 2020.

139.   Plaintiff reported Mr. Sundberg's behavior to senior management and Human Resources for Defendant.

140.   Plaintiff reported continued discrimination and harassment at least fifteen (15) additional times.

141.   Defendant did not provide Plaintiff the support and authority he needed to manage and discipline his staff.

142.    Defendant allowed Mr. Sundberg to continuously display aggression and make negative comments about Plaintiff in front of peers, direct reports, and consultants–damaging his ability to effectively manage and achieve success.

143.    Defendant allowed Mr. Sundberg to continue unchecked and made Plaintiff's work environment uncomfortable and unwelcome for any reasonable person.

144.    Defendant and their management staff refused to listen to or investigate Plaintiff's complaints of race discrimination.

145.    Plaintiff made requisite steps to remedy the situation by calling Defendant's Ethics hotline and making a complaint about the hostile work environment along with another anonymous coworker.

146.    Plaintiff reached out to Human Resources for Defendant to address these same concerns after no action was taken against Mr. Sundberg.

147.    Defendant violated Plaintiff's privacy by leaking information of his complaint to Mr. Sundberg and opening Plaintiff up to retaliation from Mr. Sundberg.

148.    Defendant ignored Plaintiff's request for support and/or investigation when dealing with Mr. Sundberg, and only intervened and removed Mr. Sundberg from the team when a *White* employee made a complaint.

149.    Defendant, under the guise of trying to remedy the situation and separate Mr. Sundberg from the team, promoted Mr. Sundberg to a more lucrative/higher position in a different team.

150.    Defendant further punished Plaintiff by taking away Plaintiff's most lucrative accounts and transferring them to a less qualified, White employee while giving Plaintiff a less lucrative portfolio to manage.

151.    In doing so, Defendant greatly impacted both Plaintiff's bonus potential for 2021 and growth potential within the company.

152.    Defendant's lack of action to address Plaintiff's race discrimination, harassment, and hostile work environment and their retaliation against Plaintiff gave Plaintiff no other choice but to resign from his position with Defendant.

153.    Defendant subject Plaintiff to adverse and different terms and conditions of employment than his White counterpart (Mr. Sundberg).

154.    Defendant made employment-based decisions based on Plaintiff's race that would not have occurred but for this discrimination, as evidenced by the disparate treatment of other employees of similar status and/or race.

155.    Defendant intentionally gave preferential treatment to employees that were not African American or another minority race, intentionally targeting for termination minority employees, including Plaintiff, while protecting White employees.

156.    Defendant intentionally deprived Plaintiff of the same terms and conditions of employment available to Plaintiff's White peers.

157.    Defendant intentionally denied Plaintiff the opportunity to work in an environment that was free from unlawful discrimination, as exemplified by the failure of Human Resources to take his race discrimination complaint seriously.

158.    As a direct, proximate, and foreseeable result of Defendant's unlawful conduct, Plaintiff suffered, and will continue to suffer, physical damages including distress in an amount to be proven at trial.

159.    As a result of Defendant's conduct as alleged herein, Plaintiff is entitled to reasonable attorneys' fees and costs of suit as provided by applicable law.

160.    Defendant's unlawful conduct was egregious, outrageous, and malicious and was in conscious disregard of Plaintiff's rights; as a result, Plaintiff is entitled to punitive damages.

## COUNT V
## 42 U.S.C. § 1981 - RETALIATION
## AGAINST MAXIMUS, INC.

161.    Plaintiff incorporates by reference each and every preceding paragraph, as though set forth fully herein.

162.    Plaintiff made complaints to Defendant and Defendant's management personnel regarding Mr. Sundberg's racist comments, aggressive behavior, and continual harassment.

163.    Defendant and their management staff refused to listen to or investigate Plaintiff's complaints of race discrimination.

164.    Plaintiff made requisite steps to remedy the situation by calling Defendant's Ethics hotline and making a complaint about the hostile work environment.

165.    Plaintiff reached out to Human Resources for Defendant to address these same concerns after no action was taken against Mr. Sundberg.

166.    Defendant violated Plaintiff's privacy by leaking information of his complaint to Mr. Sundberg and opening Plaintiff up to retaliation from Mr. Sundberg.

167.    Defendant ignored Plaintiff's request for support and/or investigation when dealing with Mr. Sundberg, and only intervened and removed Mr. Sundberg from the team when a *White* employee made a complaint.

168.    Defendant promoted Mr. Sundberg to a more lucrative/higher position on a different team and, in turn, punished Plaintiff by taking away Plaintiff's most lucrative accounts and transferring them to a less qualified, White employee while giving Plaintiff a less lucrative portfolio to manage.

169.    Defendant greatly impacted both Plaintiff's bonus potential for 2021 and growth potential within the company.

170.    Defendant's lack of action to address Plaintiff's race discrimination, harassment, and hostile work environment and their retaliation against Plaintiff gave Plaintiff no other choice but to resign from his position with Defendant.

171.    As an actual and proximate cause of Defendant's conduct, Plaintiff has suffered physical injury, emotional distress, embarrassment, humiliation, and lost wages and benefits.

172.    Plaintiff seeks nominal, compensatory, and punitive damages to compensate him for harm inflicted by Defendant. Plaintiff seeks back pay with pre and post judgment interest, front pay, reimbursement for lost benefits, compensation for emotional distress, and repayment of his attorneys' fees and litigation costs and expenses.

## COUNT VI
## CODE OF VIRGINIA §2.2-3900, *et seq.* - RACE DISCRIMINATION AGAINST MAXIMUS, INC.

173.    Plaintiff incorporates by reference each and every preceding paragraph, as though set forth fully herein.

174.    The VHRA states, "Conduct that violates any Virginia or federal statute or regulation governing discrimination on the basis of race, color, religion, sex, sexual orientation, gender identity, marital status, pregnancy, childbirth or related medical conditions including lactation, age, marital status, disability, or national origin is an unlawful discriminatory practice under this chapter." Va. Code §2.2-3902.

175.    The VHRA defines an "employee" as "an individual employed by an employer." Va. Code §2.2-3905(A).

176.    The VHRA further defines an "employer" as "a person employing (i) 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such a person." Va. Code §2.2-3905(A).

177.    At all relevant times, Plaintiff was an employee of Defendant, and Defendant was Plaintiff's employer, pursuant to the VHRA.

178.    The VHRA makes it unlawful for an employer to "[f]ail or refuse to hire, discharge, or otherwise discriminate against any individual with respect to such individual's compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, sexual orientation, gender identity, marital status, pregnancy, childbirth or related medical conditions including lactation, age, military status, disability, or national origin." Va. Code §2.2-3905(B)(1)(a).

179.    Additionally, the VHRA makes it unlawful for an employer "to use race, color, religion, sex, sexual orientation, gender identity, marital status, pregnancy, childbirth or related medical conditions, age, military status, disability, or national origin as a motivating factor for any employment practice, even though other factors also motivate the practice." Va. Code §2.2-3905(B)(6).

180.    Defendant's conduct alleged herein was an unlawful discriminatory practice on the basis of race or color in violation of the VHRA and federal law.

181.    As a result of the unlawful discrimination, Plaintiff suffered lost wages and compensation, plus interest running from the date of his separation.

182.    Plaintiff is also entitled to an award of attorneys' fees in an amount authorized by the VHRA.

**COUNT VII**
**CODE OF VIRGINIA §2.2-3900, *et seq.* - SEXUAL ORIENTATION DISCRIMINATION AGAINST MAXIMUS, INC.**

183.    Plaintiff incorporates by reference each and every preceding paragraph, as though set forth fully herein.

184.    The VHRA states, "Conduct that violates any Virginia or federal statute or regulation governing discrimination on the basis of race, color, religion, sex, sexual orientation, gender identity, marital status, pregnancy, childbirth or related medical conditions including lactation, age, marital status, disability, or national origin is an unlawful discriminatory practice under this chapter." Va. Code §2.2-3902.

185.    The VHRA defines an "employee" as "an individual employed by an employer." Va. Code §2.2-3905(A).

186.    The VHRA further defines an "employer" as "a person employing (i) 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such a person." Va. Code §2.2-3905(A).

187.    At all relevant times, Plaintiff was an employee of Defendant, and Defendant was Plaintiff's employer, pursuant to the VHRA.

188.    The VHRA makes it unlawful for an employer to "[f]ail or refuse to hire, discharge, or otherwise discriminate against any individual with respect to such individual's compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, sexual orientation, gender identity, marital status, pregnancy, childbirth or related medical conditions including lactation, age, military status, disability, or national origin." Va. Code §2.2-3905(B)(1)(a).

189.    Additionally, the VHRA makes it unlawful for an employer "to use race, color, religion, sex, sexual orientation, gender identity, marital status, pregnancy, childbirth or related medical conditions, age, military status, disability, or national origin as a motivating factor for any employment practice, even though other factors also motivate the practice." Va. Code §2.2-3905(B)(6).

190.    Defendant's conduct alleged herein was an unlawful discriminatory practice on the basis of sexual orientation in violation of the VHRA and federal law.

191.    As a result of the unlawful discrimination, Plaintiff suffered lost wages and compensation, plus interest running from the date of his separation.

192.    Plaintiff is also entitled to an award of attorneys' fees in an amount authorized by the VHRA.

**COUNT VIII**
**CODE OF VIRGINIA §2.2-3900,** *et seq.* **- RETALIATION**
**AGAINST MAXIMUS, INC.**

193.    Plaintiff incorporates by reference each and every preceding paragraph, as though set forth fully herein.

194.    The VHRA makes it unlawful for an employer "to discriminate against any employees or applicants for employment . . . because such individual has opposed any practice made an unlawful discriminatory practice by this chapter or because such individual has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." Va. Code §2.2-3905(B)(7).

195.    Defendant's conduct alleged herein was an unlawful discriminatory practice on the basis of race or color and sexual orientation in violation of the VHRA and federal law, of which Plaintiff complained of to Defendant.

196.    Defendant illegally retaliated against Plaintiff, by terminating his employment, for his reporting and complaining of Defendant's pattern and practice of discriminating based on race, pursuant to the VHRA.

197.    As a result of the unlawful retaliation, Plaintiff suffered lost wages and compensation, plus interest running from the date of his separation.

198.    Plaintiff is also entitled to an award of attorneys' fees in an amount authorized by the VHRA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Brian Richardson, respectfully requests that this Honorable Court enter judgment in his favor on all Counts of his Complaint and against Defendant, MAXIMUS, Inc., and that he be awarded the following relief:

A.  Entry of judgment in favor of Plaintiff and against Defendant;

B.  Lost wages;

C.  Compensatory damages;

D.  Punitive damages;

E.  Reasonable attorneys' fees and court costs associated with this suit and claims;

F.  Pre- and post-judgment interest, costs, and disbursement as appropriate herein; and

G.  All other relief as may be appropriate, and that this Court deems equitable, appropriate, and just.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully Submitted,

*/s/ Kristen Farr*
Kristen Farr
THE SPIGGLE LAW FIRM, PLLC
3601 Eisenhower Ave, Suite 425
Alexandria, Virginia 22304
Telephone: (202) 449-8527
Facsimile: (202) 517-9179
E-Mail: kfarr@spigglelaw.com

*Counsel for Plaintiff Brian Richardson*