IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| BRIAN RICHARDSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:22-cv-746 (RDA/JFA) |
| | ) | |
| MAXIMUS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter comes before the Court on Defendant Maximus, Inc.'s Motion for Summary Judgment (Dkt. 43) and Motion to Strike Exhibits in Support of Plaintiff's Opposition to Motion for Summary Judgment ("Motion to Strike") (Dkt. 49). The Court dispenses with oral argument as it would not aid in the decisional process. *See* Fed. R. Civ. P. 78(b); E.D. Va. Loc. Civ. R. 7(J). The Motions are now ripe for disposition. Considering the Motions together with Defendant's Memoranda in Support (Dkt. Nos. 45; 50); Plaintiff Brian Richardson's Oppositions (Dkt. Nos. 47; 53), Defendant's Replies (Dkt. Nos. 52; 55), this Court GRANTS-IN-PART and DENIES-IN-PART Defendant's Motion to Strike (Dkt. 49) and GRANTS-IN-PART and DENIES-IN-PART Defendant's Motion for Summary Judgment (Dkt. 43) for the reasons that follow.

## I. MOTION TO STRIKE

In its Motion to Strike, Defendant moves this Court to strike "inadmissible, unauthentic, and improper evidence" filed by Plaintiff in support of his Opposition to Defendant's Motion for Summary Judgment. Dkt. 50 at 1. In particular, Defendant first requests that the Court strike the declarations of Doug McEachern (PX H) and Anna Sever (PX M) in their entirety because Sever and McEachern were never disclosed by Plaintiff in his Rule 26 disclosures or in his responses to

Maximus' discovery requests. Dkt. 50 at 2.[1]  Second, Defendant asks that the Court partially strike the declarations of Gary Kennedy, Regie Turner, and William "Jay" Murray, as well as Plaintiff's own declaration, as they contain conclusory statements without objective corroboration, speculation, hearsay, and are not based on personal knowledge. *Id.*  Lastly, Plaintiff requests that the Court strike three transcripts of allegedly recorded conversations between Plaintiff and employees of Maximus because Plaintiff made no attempt to authenticate those transcripts and they consist entirely of inadmissible hearsay. *Id.*

Beginning with Defendant's first request, Federal Rule of Civil Procedure 26(a)(1) requires parties to provide initial disclosures including "the name and, if known, the address and telephone number of each individual likely to have discoverable information . . . that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment."  This obligation to disclose pertinent witnesses is continuing, meaning that a party must supplement its disclosures or discovery responses "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A).  Rule 37(c)(1), in turn, provides that a party who fails to identify a witness in a timely fashion pursuant to Rule 26(a) or (e) may not use that "witness to supply evidence on a motion . . . , unless the failure was substantially justified or harmless."

Despite his failure to comply with Rule 26(a)(1), Plaintiff urges the Court not to exclude the McEachern and Sever declarations because the declarants' names came up during the course of discovery.  Dkt. 53 at 2.  Therefore, Plaintiff reasons, allowing this evidence would not cause

---

[1] Throughout the instant Memorandum Opinion and Order, this Court refers to the exhibits attached to Plaintiff's Opposition to Defendant's Motion for Summary Judgment as "PX" and refers to the exhibits attached to Defendant's Motion for Summary Judgment as "DX."

Defendant any unfair surprise.  *Id.*  In support of his argument, Plaintiff points to two excerpts from his own depositions in which these or similar names were mentioned in passing.  *Id.*  In his first deposition, Plaintiff referred to a "Doug McKietren" who was present at a Maximus event before Plaintiff was even hired.  Dkt. 53-1 (Pl. Dep I) at 92:2-7.  Plaintiff otherwise only mentioned "Anna Seaver" and "Doug McKietren" in that deposition as being among the "40-plus people on the team" that reported to Allison Patrick.  *Id.* at 159:10-15.  And in his second deposition, Plaintiff merely mentioned Sever as a person on Patrick's team who "had an issue, . . . left and [was] replaced . . . ."  Dkt. 53-2 (Pl. Dep II") at 93:12-14.

The Court finds that these brief references to McEachern and Sever in Plaintiff's depositions were wholly insufficient to alert Defendant to the fact that they were potential witnesses with information about Plaintiff's allegations and that Defendant should thus depose them.  Moreover, Plaintiff does not argue that he was substantially justified in failing to disclose these two witnesses.  Accordingly, the Court will not consider the McEachern and Sever declarations in ruling on Defendant's Motion for Summary Judgment.  *See Hoyle v. Freightliner, LLC*, 650 F.3d 321, 329-30 (4th Cir. 2011) (affirming district court's order striking a declaration from a witness whom others referenced in deposition testimony but whom the plaintiff did not disclose until after the defendant had moved for summary judgment).

The Court next examines Defendant's remaining objections to Plaintiff's exhibits.  Federal Rule of Civil Procedure 56(c) sets forth the specific methods a party *must* use to establish the undisputed (or disputed) nature of a material fact.  A party must either: (1) cite to "particular parts of materials in the record," Fed. R. Civ. P. 56(c)(1)(A); or (2) show that the cited materials "do not establish the absence or presence of a genuine dispute, or that" no "admissible evidence" can be produced to "support the fact[,]"  Fed. R. Civ. P. 56(c)(1)(B).  Critically, a proper objection

pursuant to Federal Rule of Civil Procedure 56(c)(1)(B) is that the underlying evidence "*cannot be presented in a form that would be admissible in evidence.*"  Fed. R. Civ. P. 56(c)(2) (emphasis added).  That means that to prevail on such an objection, the objector must show more than the mere fact that the evidence was not presented in admissible form in support of summary judgment—he must show that the proponent of such evidence would not be able to establish its admissibility at trial.  *Jones v. Western Tidewater Reg'l Jail*, 187 F. Supp. 3d 648, 654 (E.D. Va. 2016); *see also Ridgell v. Astrue*, No. CIV.A. DKC 10-3280, 2012 WL 707008, at \*9 (D. Md. Mar. 2, 2012) ("To the extent [Plaintiff] contests the admissibility of Defendant's exhibits based on authenticity grounds, she does not actually argue that Defendant cannot produce admissible versions of the same for trial.  Her objection, then, may not be proper under Rule 56.").

In the instant case, Defendant attempts to establish the absence of factual disputes by showing that certain evidence that Plaintiff points to in support of its Opposition is inadmissible. However, Defendant does not do so in accordance with the strict requirements of Rule 56(c). Importantly, while Defendant objects to some of Plaintiff's exhibits on the grounds of hearsay, lack of personal knowledge, and failure to authenticate, Defendant does not show that the facts presented in those exhibits cannot be presented in an admissible form pursuant to Federal Rule of Civil Procedure 56(c)(2).  Accordingly, Defendant's Motion to Strike is denied to the extent that Defendant asks this Court to find that a fact is undisputed on the basis of the inadmissibility of Plaintiff's exhibits.

## II. MOTION FOR SUMMARY JUDGMENT

### A. BACKGROUND

#### 1. Factual Background[2]

In providing the factual background, the Court recounts the undisputed[3] material facts for the purpose of resolving Defendant's Motion for Summary Judgment.  *See* Dkt. Nos. 45 ¶¶ 1-86 (Defendant's statement of undisputed material facts); 47 at 3-28 (Plaintiffs' response to Defendant's statement of undisputed material facts).  When relevant, the Court includes disputed facts (and notes them as such), but the disputed facts do not control the disposition.

##### a. Plaintiff's Protected Identities

Plaintiff Brian Richardson ("Plaintiff") is a Black man.  Dkt. 45 ¶ 1 (citing Dkt. 1 ¶ 15). Plaintiff testified during a deposition that he has dated both men and women throughout his life, and that, if he had to put himself "into a box, [he] would say [he is] gay."  Dkt. 47 ¶ 3 (quoting PX A (1/30/23 Pl. Dep.) at 315:5-12).

---

[2] As an initial matter, some of the material facts that Plaintiff attempts to place in dispute are not actually disputed because Plaintiff merely seeks to provide additional information to supplement or qualify those facts.  *See, e.g.*, Dkt. 47 ¶¶ 11, 20-21, 22, 26.  This is not a viable method of disputing a material fact on summary judgment.  *See Emmons v. City of Chesapeake*, No. 2:18cv635, 2019 WL 8062700, at *2 (E.D. Va. Oct. 15, 2019), *aff'd* 982 F.3d 245 (4th Cir. 2020) ("While the parties appear to disagree about the characterization of some facts put forth by the opposing party or feel the need to supplement or qualify the opposing party's stated facts, Plaintiffs and Defendant do not have any genuine disputes regarding facts necessary and material to resolution of the . . . case.").  Therefore, the Court treats those facts as undisputed.  *See* Fed. R. Civ. P. 56(e)(2) (permitting the court to consider improperly supported or inadequately addressed facts as undisputed for the purpose of summary judgment).

[3] The Court treats any facts that are listed in Defendants' statement of undisputed material facts and not specifically controverted by Plaintiffs as admitted.  *Hayes v. Sotera Def. Sol's, Inc.*, 1:15-cv-1130, 2016 WL 2827515, at *2 (E.D. Va. May 12, 2016).

b. Plaintiff's Employment at Maximus and Working Relationship with Harry Sundberg

Plaintiff was hired by Maximus' former Senior Vice President of Sales, Allison Patrick. Dkt. 45 ¶ 4 (citing DX B (Patrick Dep.) at 8:12-9:12; DX A (1/30/23 Pl. Dep.) at 87:2-5).[4] Plaintiff began his employment with Maximus on December 16, 2019. *Id.* ¶ 5 (citing DX C (Pl. HRIS Profile) at DEF 00200). For the majority of his employment with Maximus, Plaintiff reported directly to Patrick. *Id.* ¶ 12 (citing DX B (Patrick Dep.) at 8:12-9:12; DX A (1/30/23 Pl. Dep.) at 159:4-8, 211:20-21).

At Maximus, Plaintiff held the title of Vice President of Business Development for Civilian & DoD Accounts. *Id.* ¶ 6 (citing Dkt. 1 ¶ 14). Plaintiff's position was part of the Maximus U.S. Federal Services Segment ("Federal Segment"). *Id.* ¶ 7 (citing DX D (Pl.'s Resume) at RICHARDSON_000748). Plaintiff's primary responsibilities included identifying new contracting opportunities with the federal government and presenting plans to acquire the contracts to other teams within the Federal Segment. *Id.* ¶ 8 (citing DX D (Pl.'s Resume) at RICHARDSON_000748-49). Plaintiff oversaw a team of individuals who reported directly to him. *Id.* ¶ 9 (citing Dkt. 1 ¶ 15). Plaintiff was responsible for meeting sales goals assigned by Maximus. *Id.* ¶ 10 (citing DX B (Patrick Dep.) at 11:1-9). In 2021, Plaintiff's bonus plan set Plaintiff's individual revenue goal at $600 million; Plaintiff only generated $19.1 million in revenue in 2021. *Id.* ¶ 11 (citing DX E (Iracheta Decl.) ¶ 8).

Harry Sundberg ("Sundberg") was a Senior Vice President of another team within the Maximus Federal Segment during Plaintiff's employment. *Id.* ¶ 18 (citing DX H (Sundberg Decl.) ¶ 3). Plaintiff was responsible for growing and developing Maximus's business with agencies that

---

[4] The Court can properly consider the exhibits attached to Defendant's Motion for Summary Judgment that Plaintiff did not object to. *McCloud v. Rice*, 4:20-cv-4, 2022 WL 18146043, at *3 (E.D. Va. Dec. 21, 2022).

Sundberg's team oversaw. *Id.* ¶ 19 (citing DX I (Sundberg Dep.) at 12:8-17). Plaintiff's team worked in tandem with Sundberg and Sundberg's team to procure government contracts. *Id.* ¶ 21 (citing DX B (Patrick Dep.) at 12:20-13; DX H (Sundberg Decl.) ¶ 3). Plaintiff never reported directly to Sundberg. *Id.* ¶ 22 (citing DX B (Patrick Dep.) at 75:8-9; DX H (Sundberg Decl.) ¶ 4). Plaintiff claims that Sundberg continuously went to Patrick to request that Plaintiff be disciplined. Dkt. 47 ¶ 23 (citing PX C (Pl. Decl.) ¶ 6).

Plaintiff's team had a standing weekly Opportunity Meeting with Sundberg's team, during which the teams would discuss the status of new business opportunities, potential partners, and progress toward formal bid submissions. Dkt. 45 ¶ 24 (citing DX I (Sundberg Dep.) at 14:2-11, 28:18-31:7). Plaintiff set the agenda for these meetings and was put in charge of running the meetings at Patrick's request. *Id.* ¶ 26 (citing DX H (Sundberg Decl.) ¶ 5; DX I (Sundberg Dep.) at 30:2-15). Sundberg would oftentimes become frustrated and combative with Plaintiff at these meetings. Dkt. Nos. 45 ¶ 28 (citing DX G (Salanik Decl.) ¶¶ 5, 7-8; DX H (Sundberg Decl.) ¶¶ 6-7; DX J (Willoughby Dep.) at 88:10-89:5); 47 ¶¶ 27-28 (citing PX F (Willoughby Dep.) at 58:1-22; PX J (Murray Decl.) ¶ 5). Defendant claims that Sundberg's frustration with Plaintiff stemmed from Plaintiff's poor job performance. Dkt. 45 ¶ 28 (citing DX G (Salanik Decl.) ¶¶ 5, 7-8; DX H (Sundberg Decl.) ¶¶ 6-7; DX J (Willoughby Dep.) at 88:10-89:5). Plaintiff, however, alleges that this frustration reflected a more personal animus towards Plaintiff due to Plaintiff's race and Sundberg's perception of Plaintiff's sexuality. *See generally* Dkt. 47 at 25-28 (recounting some of Sundberg's racist and homophobic comments about Plaintiff, which the Court discusses in more detail *infra*). Plaintiff claims that, at these Opportunity Meetings, Sundberg would become angry at Plaintiff for things outside his control, would raise his voice at Plaintiff for no reason, and would

regularly speak over Plaintiff and cut him off.  *Id.* ¶¶ 27-28 (citing PX E (Kennedy Decl.) ¶ 5; PX J (Murray Decl.) ¶ 5).

### c. Sundberg's Racist and Homophobic Comments Towards Plaintiff

Plaintiff alleges that Sundberg made several racist and homophobic comments.  When Plaintiff was interviewed by Iracheta during the HR Investigation into his allegations about Sundberg (outlined in further detail *infra*), Plaintiff claimed that Sundberg had called him "boy" and said he needed to learn his place.  Dkt. 45 at 17 (citing DX F (HR Invest. Summ.)).  Sundberg denied calling Plaintiff "boy," but admitted that he said that Plaintiff "didn't know his place."  *Id.* (citing DX F (HR Invest. Summ.)).  Further, Plaintiff alleges (and Defendant denies) that Sundberg called him the n-word during an Opportunity Meeting.  Dkt. 47 at 32 (citing PX N (Turner Decl.) ¶ 15); *see also* Dkt. 1 ¶¶ 20, 75b, 136b.  Plaintiff also claims that Sundberg saw a photo of Plaintiff's fraternity and called it a "gang"—an allegation that Defendant, again, denies.  *Id.* 45 at 19 (citing Dkt. 1 ¶¶ 21, 26, 75d, 136c); *see also* Dkt. 47 at 25 (citing PX N (Turner Decl.) ¶ 13).  Plaintiff additionally alleges that Sundberg made the following derogatory comments about his sexual orientation: Sundberg called him a "mamsy-pamsy,"[5] Sundberg said he was too sensitive and girly, and Sundberg said that people over 30 who are unmarried are either crazy or gay.  Dkt. 47 at 34 (citing PX A (1/30/23 Pl. Dep.) at 224:20-22, 237:13-14).  And at some point during his employment at Maximus (though it is unclear when), Plaintiff alleges that Sundberg started a

---

[5] The parties dispute the precise language Sundberg used in referring to Plaintiff. Defendant asserts that Sundberg referred to Plaintiff as "namby-pamby," Dkt. 45 ¶ 41 (citing DX F (HR Invest. Summ.) at DEF 00378-79; Ex. I (Sundberg Dep.) at 34:4-38:1, 53:5-54:15). However, Plaintiff alleged in his Complaint that Sundberg used the term "mamby-pamby," Dkt. 1 ¶ 22, and now in his Opposition asserts that the term Sundberg actually used was "mamsy-pamsy," Dkt. 47 at 16 (citing PX A ("1/30/23 Pl. Dep.") at 227:7-9).  Regardless, the precise term that Sundberg used is irrelevant for purposes of resolving Defendant's Motion for Summary Judgment.

rumor that Plaintiff had been terminated from a previous place of employment.  *Id.* at 25 (citing PX N (Turner Decl.) ¶ 12).

Leslie Willoughby is a multi-racial woman who reported directly to another Maximus employee named Robert Santos in 2020 and 2021 and whose second line supervisor was Harry Sundberg.  Dkt. 45 ¶ 33 (citing DX J (Willoughby Dep.) at 8:7-17, 10:8-12, 10:20-11:3).  Willoughby attended some of the weekly Opportunity Meetings.  Dkt. Nos. 45 ¶ 34 (citing DX J (Willoughby Dep.) at 11:20-12:21); Dkt. 47 at 13.  Willoughby never witnessed Sundberg make racist or homophobic comments towards Plaintiff or anyone else.  Dkt. 45 ¶ 35 (citing DX J (Willoughby Dep.) at 73:11-74:8, 89:1-11).

d. Plaintiff's Internal Complaints About Sundberg and Maximus' Subsequent Investigations

Plaintiff claims (and Defendant disputes) that he complained to HR that Sundberg was subjecting him to a hostile work environment, first, in January 2021, and then again, in February 2021.  Dkt. 47 ¶¶ 40, 46, 48 (citing PX C (Pl. Decl.) ¶¶ 11, 13).  Subsequently, on March 23, 2021, Sundberg reported to Norman Iracheta, the Vice President of Maximus Human Resources, that Plaintiff was alleging that Sundberg made certain racist and homophobic remarks towards him.  Dkt. 45 ¶ 40 (citing DX F (HR Invest. Summ.) at DEF 00378).  Prior to Sundberg making this report, Denise Moscatelli, the Senior Vice President of Capture, had told him that Plaintiff believed the "mamsy-pamsy" or "namby-pamby" comment was homophobic.  *Id.* (citing DX I (Sundberg Dep.) at 32:20-34:6).  Plaintiff claims (and Defendant denies) that, as reprisal for Plaintiff complaining about him, Sundberg reached out to recruiters and told them that Plaintiff was looking for a new job.  Dkt. 47 at 38 (citing PX V ((Richardson Document Production) at 201).

After receiving Sundberg's report, Iracheta initiated a Human Resources investigation (the "HR Investigation") into Plaintiff's allegations against Sundberg.  Dkt. 45 ¶ 44 (citing DX F (HR

Invest. Summ.) at DEF 00378-79).  Iracheta contacted Plaintiff on April 5, 2021 to request an interview regarding the allegations reported by Sundberg.  *Id.* ¶ 45 (citing DX F (HR Invest. Summ.) at DEF 00382).  Plaintiff responded to Iracheta on April 12, 2021.  *Id.* ¶ 46 (citing DX F (HR Invest. Summ.) at DEF 00382).  On April 22, 2021, Iracheta conducted a full interview with Plaintiff.  *Id.* ¶ 47 (citing DX F (HR Invest. Summ.) at DEF 00383).  During that interview, Plaintiff alleged that, throughout the entirety of Plaintiff's employment, Sundberg had been making racist and hostile comments towards him.  *Id.* ¶ 48 (citing DX F (HR Invest. Summ.)).  Plaintiff also told Iracheta that an example of Sundberg's racist behavior was Sundberg calling Plaintiff by the name of another Black employee, Ronald Scott.  Dkt. Nos. 45 ¶ 57 (citing DX F (HR Invest. Summ.)); 47 at 19 (citing PX B (Patrick Dep.) at 42:3-5).  Iracheta interviewed four other employees as part of the HR Investigation, all of whom participated in the Opportunity Meetings.  Dkt. 45 ¶ 60.  None of these individuals reported having heard any comments relating to Plaintiff's race, gender or sexual orientation.  *Id.* (citing DX F (HR Invest. Summ.) at DEF 00379); *see also* DX F (HR Invest. Summ.) at DEF 00385-00390 (witness interview summaries), 00390-391 (investigation findings).  One of the employees interviewed was Regina Bornarth.  DX F (HR Invest. Summ) at DEF 000388-89.  In her interview with Iracheta, Bornarth shared that Plaintiff and Sundberg did not work well together, creating a tense environment for everyone present at the Opportunity Meetings.  *Id.*  Bornarth also indicated that she had approached Patrick directly to request a transfer to a different team because she was no longer comfortable reporting to Plaintiff.  Dkt. 45 ¶ 13 (citing DX F (HR Invest. Summ.) at DEF 000388).

On May 10, 2021, an anonymous individual filed a report with the Maximus Ethics Hotline ("Hotline Report").  *Id.* ¶ 63 (citing DX O (Ethics Hotline Report Summary) at DEF 00331).  Plaintiff now claims that that anonymous individual was him.  Dkt. 47 at 38.  The Hotline Report

alleged that Sundberg and another Senior Vice President had made racially discriminatory comments about Black employees and generally created a hostile work environment.  Dkt. 45 ¶ 64 (citing DX O (Ethics Hotline Report Summary) at DEF 00331).

In response to the Hotline Report, Sheryl Knutson, Senior Specialist of Corporate Ethics and Compliance, initiated an investigation (the "Ethics Investigation").  *Id.* ¶ 65 (citing DX O (Ethics Hotline Report Summary) at DEF 00332; DX P (Knutson Decl.) ¶ 1).  Knutson interviewed Plaintiff as part of the Ethics Investigation on June 3, 2021.  *Id.* ¶ 66 (citing DX P (Ethics Invest. Rpt.) at DEF 00362).   Knutson also interviewed William "Jay" Murray, Willoughby, Taneal Anhert-Rogers, Gary Kennedy, Anne Keter, and Reggie Turner, all of whom had been identified as witnesses to Sundberg's behavior towards Plaintiff.  *Id.* ¶ 67 (citing DX P (Ethics Invest. Rpt.) at DEF 00362).  During the pendency of the HR and Ethics Investigations, Iracheta received a letter from Plaintiff's counsel, dated May 14, 2021, that outlined the allegations that form the basis of Plaintiff's Complaint in the instant case.  *Id.* ¶ 68 (citing DX Q (Letter from Kristen Farr to Iracheta)).  Iracheta investigated and evaluated the validity of each of the allegations contained in Plaintiff's counsel's letter.  *Id.* ¶ 69 (citing DX M (Iracheta Dep.) at 79:10-21).  Over the course of the two Investigations, Maximus interviewed Plaintiff twice, spoke with Sundberg, interviewed twelve additional witnesses, and reviewed emails and text messages that Plaintiff was willing to provide.  *Id.* ¶ 70 (citing DX P (Ethics Invest. Rpt.) at DEF 00362; DX F (HR Invest. Summ.) at DEF 00384).

The HR Investigation made the following relevant findings that substantiated some of Plaintiff's allegations: Sundberg admitted to using the term "namby pamby," Sundberg admitted to telling Plaintiff he was too sensitive in relation to a meeting interaction, and Sundberg admitted to mixing up Plaintiff's name with another black male employee by accident.  Dkt. 47 ¶ 71 (citing

PX Y (HR Invest. Summ.) at 00390).  At the same time, however, the HR Investigation found that Plaintiff was frequently the instigator of arguments with Sundberg during the Opportunity Meetings.  Dkt 45 ¶ 32 (citing DX F (HR Invest. Summ.) at DEF 000386, DEF 000390).  The HR Investigation also found that, at some point after hearing about Plaintiff's allegations against him, Sundberg approached Plaintiff in an attempt to remedy the situation and move forward.  Dkt. 47 ¶ 71 (citing PX Y (HR Invest. Summ.) at 00390).

And the Ethics Investigation made the following relevant findings: "witnesses validated the report that some African American team members were treated disrespectfully and rudely by the named leaders"; two senior witnesses stated that "there appears to be a systemic problem with discrimination within the Maximus leadership team"; and some members of the Business Development team stated that the weekly Opportunity meetings were overtaken by one of the accused SVPs, who treated the African-American VP who is supposed to be leading the meeting "rudely and disrespectfully."  *Id.* at 21-22 (citing PX Z (Ethics Invest. Rpt.) at 00363-64).  To avoid further conflict, Maximus determined that the Opportunity Meetings should be discontinued and that efforts would be made to minimize the interaction between Sundberg and Plaintiff.  Dkt. 45 ¶ 72 (citing DX M (Iracheta Dep.) at 34:10-35:5, 56:11-57:22, 75:13-76:19; DX P (Knutson Decl.) ¶ 3; DX P (Ethics Invest. Rpt.) at DEF 00364; DX F (HR Invest. Summ.) at DEF 00391).

As a result, in May 2021, Sundberg was moved to a different position at Maximus, in which he was no longer supposed to be working with Plaintiff.  *Id.* ¶ 73 (citing DX M (Iracheta Dep.) at 34:10-35:5, 81:20-82:6; DX I (Sundberg, Dep.) at 23:18-24:4; DX H (Sundberg Decl.) ¶¶ 1-2).  Although Sundberg had been instructed not to attend the Opportunity Meetings, Plaintiff claims that Sundberg "continued to attend every single one of those meetings."  Dkt. 47 ¶ 73 (citing PX O (4/21/23 Pl. Dep.) at 164:18-165:2).  After Sundberg was moved to a different position, Plaintiff

texted several colleagues inquiring into Sundberg's lingering presence at the Opportunity Meetings.  Dkt. 47 ¶¶ 73, 75 (citing PX O (4/21/23 Pl. Dep.) at 165: 2-4).

e. Maximus' Reorganization

On March 1, 2021, Maximus Federal Services, Inc., a wholly owned subsidiary of Maximus, acquired the assets of the Federal division of Attain, LLC ("Attain").  Dkt. 45 ¶ 76.  In connection with the acquisition, Maximus issued a press release notifying its shareholders (and the public) of the purchase and of its intent to integrate the Federal division of Attain into the Federal Segment of Maximus.  *Id.* (citing DX R (Maximus, Inc., U.S. SEC Filing, Form 8-K, March 4, 2021)).  In April 2021, Maximus hired a new General Manager, Teresa Weipert, who announced that the Maximus Federal Segment would undergo a reorganization to integrate the Attain assets and employees and address related business concerns (the "Reorganization").  *Id.* ¶ 77 (citing DX M (Iracheta Dep.) at 31:16-32:11).  Patrick resigned in June of 2021 during the Reorganization. *Id.* ¶ 78 (citing DX B (Patrick Dep.) at 49:6-50:17).  Due to Patrick's departure, Plaintiff was assigned to a new supervisor.  *Id.* ¶ 79 (citing DX C (Pl. HRIS Profile) at DEF 00199-200; DX A (1/30/23 Pl. Dep.) at 179:17-180:8).

Plaintiff was not demoted, terminated, or asked to resign as a result of the Reorganization, *id.* ¶¶ 81, 85 (citing DX A (1/30/23 Pl. Dep.) at 293:16-294:6; DX C (Pl. HRIS Profile)), and Plaintiff's pay, benefits, job title and responsibilities remained the same during the Reorganization, *id.* ¶ 80 (citing DX C (Pl. HRIS Profile)).  However, Plaintiff claims that his major accounts were stripped from him, Dkt. 47 at 39 (citing PX C (Pl. Decl.)), and that he was reassigned to the Department of the Interior and the Department of Labor, *id.* (citing PX CC (Pl. 568)).  Plaintiff also alleges that, prior to the Reorganization, he supervised three full-time employees, two consultants, and two interns: Bornarth, Kennedy, Murray, John Nyce, Andrea Mccarthy, Ale

Garcia, and Aaron (whose last name Plaintiff does not recall), but after the Reorganization, the only employee left for Plaintiff to supervise was Kennedy, and even he was reassigned a week or two after the Reorganization.  Dkt. 47 ¶ 83 (citing PX C (Pl. Decl.) ¶ 15).  On July 26, 2021, Plaintiff tendered his resignation to Maximus, effective August 6, 2021.  Dkt. 45 ¶ 86 (citing DX S (Plaintiff's Resignation Email)).

## 2. Procedural Background

On July 5, 2022, Plaintiff filed a Complaint in this Court.  Dkt. 1.  On May 17, 2023, Defendant filed a Motion for Summary Judgment, Dkt. 43, along with a Memorandum in Support thereof, Dkt. 45.  On May 31, 2023, Plaintiff filed an Opposition to Defendant's Motion for Summary Judgment, Dkt. 47, and Defendant filed a Reply in support of its Motion for Summary Judgment on June 6, 2023, Dkt. 52.

## B. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, "[s]ummary judgment is appropriate only if the record shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Hantz v. Prospect Mortg., LLC*, 11 F. Supp. 3d 612, 615 (E.D. Va. 2014) (quoting Fed. R. Civ. P. 56(a)).  "A disputed fact presents a genuine issue 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'"  *Id.* at 615-16 (quoting *Spriggs v. Diamond Auto. Glass*, 242 F.3d 179, 183 (4th Cir. 2001)).  The moving party bears the "initial burden to show the absence of a material fact."  *Sutherland v. SOS Intern., Ltd.*, 541 F. Supp. 2d 787, 789 (E.D. Va. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  "Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists."  *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

On summary judgment, a court reviews the evidence and draws all reasonable inferences in the light most favorable to the non-moving party. *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 570 (4th Cir. 2015) (quoting *Tolan*, 572 U.S. at 657); *McMahan v. Adept Process Servs., Inc.*, 786 F. Supp. 2d 1128, 1134-35 (E.D. Va. 2011) (citing *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003)). This is a "fundamental principle" that guides a court as it determines whether a genuine dispute of material fact within the meaning of Rule 56 exists. *Jacobs*, 780 F.3d at 570. "[A]t the summary judgment stage[,] the [Court's] function is not [it]self to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

A factual dispute alone is not enough to preclude summary judgment. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48. A "material fact" is one that might affect the outcome of a party's case. *Id.* at 248; *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). The substantive law determines whether a fact is considered "material," and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248; *Hooven-Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir. 2001). A "genuine" issue concerning a "material fact" arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the non-moving party's favor. *Anderson*, 477 U.S. at 248.

Rule 56(e) requires the non-moving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 324. "An affidavit or declaration used to support or oppose a motion [for summary judgment] must be made

15

on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). And this Court requires that the non-moving party list "all material facts as to which it is contended that there exists a genuine issue necessary to be litigated and citing the parts of the record relied on to support the facts alleged to be in dispute." E.D. Va. Loc. Civ. R. 56(B).

C. ANALYSIS

Plaintiff brings discrimination and retaliation claims against Defendant under (1) Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"); (2) the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"); and (3) the Virginia Human Rights Act ("VHRA"), Code of Virginia §2.2-3900, *et seq.* The gravamen of Plaintiff's allegations is that he was subjected to a hostile work environment because of his race and sexual orientation that ultimately resulted in his constructive discharge, and that he faced retaliation for his protected activity of internally reporting Sundberg's conduct towards him. Defendant moves the Court for summary judgment as to all counts of the Complaint. Dkt. 43. The Court begins by addressing Plaintiff's VHRA claims before turning to Plaintiff's hostile work environment, constructive discharge, and retaliation claims under Title VII and Section 1981.

1. The VHRA Claims

Defendant first asks the Court to grant summary judgment in its favor on Plaintiff's VHRA claims (Counts VI, VII, and VIII of the Complaint) because Plaintiff failed to obtain a notice of right to sue from the Virginia Office of Civil Rights, as required by statute. Dkt. 45 at 12. Plaintiff concedes that he has not done so. Dkt. 47 at 30. Nonetheless, he argues that, if the Court finds that his VHRA claims are not exhausted, the proper remedy is dismissal without prejudice of his state-law claims—not a grant of summary judgment in Defendant's favor. *Id.*

The Virginia Human Rights Act ("VHRA") includes an extensive administrative procedure that must be exhausted before an employee may file a lawsuit under the VHRA. *Jordan v. Sch. Bd. of the City of Norfolk*, Civil No. 2:22cv167, 2022 WL 16835868, at *11 (E.D. Va. Nov. 9, 2022). An aggrieved individual must make a complaint with the Virginia Office of Civil Rights (Virginia's Fair Employment Practices Agency, or "FEPA"), which then prompts FEPA to initiate an investigation to determine whether there is reasonable cause to believe the allegations of discrimination. Va. Code Ann. § 2.2-3907 (2022). Regardless of the investigation's outcome, a private citizen cannot sue until they have been provided with a "notice of [their] right to file a civil action." Va. Code Ann. § 2.2-3908(A) (2022).

Here, the record indicates that Plaintiff has received a right-to-sue notice from the EEOC, Dkt. 1 ¶ 12, but not from FEPA. Critically, federal courts have interpreted the VHRA to require a right-to-sue notice that is separate from the EEOC notice. *See Jordan*, 2022 WL 16835868, at *11-13 (rejecting employee's argument that the EEOC right-to-sue notice served as a right-to-sue notice under the VHRA); *Moss v. Saja Rest. Grp., LLC*, No. 5:22-CV-00014, 2023 WL 3034605, at *11-12 (W.D. Va. Apr. 21, 2023) (relying on *Jordan* in concluding that plaintiff's failure to request and receive a right-to-sue notification from FEPA is fatal to his state-law claims even though he received a notice from the EEOC). As such, this Court finds that Plaintiff has not complied with the exhaustion requirements of the VHRA.

Having found that Plaintiff has not administratively exhausted his VHRA claims, the Court turns to the question of what the appropriate remedy is. In support of his position that the proper remedy is dismissal without prejudice, Plaintiff directs the Court's attention to *Moss*. Dkt. 47 at 30. There, in considering the defendant's motion for summary judgment, the district court dismissed the plaintiff's state-law claims without prejudice for failure to exhaust so as to permit

him to request a right-to-sue notice.  *Moss*, 2023 WL 3034605, at *11-12.  In the instant case,
Plaintiff's failure to exhaust his VHRA claims can likewise be remedied by him obtaining a notice
of right to sue from FEPA.  Accordingly, this Court will dismiss the VHRA claims (Counts VI,
VII, and VIII of the Complaint) without prejudice.

### 2. The Hostile Work Environment Claims

For Plaintiff's hostile work environment claims to survive summary judgment, Plaintiff
must demonstrate that a reasonable jury could find that the alleged conduct by Sundberg: (1) was
unwelcome; (2) was based on his race or sexual orientation; (3) was sufficiently severe or
pervasive so as to alter the conditions of his employment and to create an abusive work
environment; and (4) was imputable to his employer.  *Evans v. Int'l Paper Co.*, 936 F.3d 183, 192
(4th Cir. 2019).  In other words, a *prima facie* hostile work environment claim is established when
a plaintiff shows "the workplace is permeated with discriminatory intimidation, ridicule, and insult
that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create
an abusive working environment."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citation
and internal quotation marks omitted).  It follows that hostile work environment claims are
therefore "based on the cumulative effect of individual acts."  *Nat'l R.R. Passenger Corp. v.
Morgan*, 536 U.S. 101, 115 (2002).[6]

In support of its motion for summary judgment, Defendant contends that the record
provides insufficient evidence to preclude summary judgment on Plaintiff's hostile work
environment claims.  Dkt. 45 at 14-28.  According to Defendant, summary judgment is proper
because the alleged conduct Plaintiff endured was not based on Plaintiff's race or sexual

---

[6] The hostile work environment analysis is the same under Title VII and Section 1981.
*Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184 (4th Cir. 2001).

orientation, was not objectively severe or pervasive, and liability cannot be imputed to Defendant. *Id.*

Defendant does not appear to contest that Plaintiff subjectively perceived Sundberg's actions and comments as unwelcome. *See* Dkt. 45 at 15 ("Clearly Plaintiff believes he was subjected to some unwelcome conduct or harassment . . . ."). The Court will therefore focus on the remaining elements of a hostile work environment claim.

### a. Conduct Based on Race or Sexual Orientation

The Court next turns to whether the unwelcome conduct was because of Plaintiff's race or sexual orientation. To survive summary judgment, Plaintiff must show that "but for" his race or sexual orientation, he would not have faced such harassment. *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 242 (4th Cir. 2002). The Court addresses each category of conduct in turn.

### i. Race-Based Conduct

Plaintiff's race-based hostile work environment claim hinges on the following allegations: Sundberg sometimes called him by the name of another African American employee; Sundberg saw a photo of Plaintiff's fraternity and called it a "gang;" Sundberg called him "boy" and said he needed to learn his place; and Sundberg used the n-word during an Opportunity Meeting. Dkt. 47 at 25 (citing PX N (Turner Decl.)), 26 (citing PX N (Turner Decl.)), 33 (citing PX P (Richardson/Willoughby audio transcription); *see also* Dkt. 1 ¶¶ 20-21, 26, 75b, 136b. While Sundberg's behavior of occasionally confusing Plaintiff's name with the name of another African American employee could perhaps be written off as an innocent mistake that merely evinces absentmindedness on Sundberg's part, the other allegations explicitly implicate racial animus. First, Sundberg's alleged "gang" comment is clearly racially charged and trades on harmful stereotypes about Black men. Second, courts have consistently found that the term "boy" can be

considered a racial epithet. *Jones v. Dole Food Co., Inc.,* 827 F.Supp.2d 532, 552 (W.D.N.C. 2011) (in a racially derogative context, the term "boy" is "never acceptable and which any reasonable, civil person would find objectionable and offensive"); *Lee v. Norfolk Southern Ry. Co.,* 912 F.Supp.2d 375, 382 (W.D.N.C. 2012) (calling an adult African American male "boy" is a "racial insult"). Here, Sundberg's use of the term "boy," taken together with his comment that Plaintiff needed to learn his place, could be construed as racially derogatory. Finally, it is beyond dispute that the n-word is an abhorrent racial slur. *Spriggs*, 242 F.3d at 185 ("Far more than a 'mere offensive utterance,' the [n-]word . . . is pure anathema to African–Americans."). Accordingly, the Court finds that a reasonable juror could conclude that at least some of the harassment Plaintiff allegedly endured was because of his race.

### ii. Sexual Orientation-Based Conduct

The Court next considers whether Sundberg's alleged harassment of Plaintiff was also due in part to Plaintiff's sexual orientation. Plaintiff's sexual orientation-based hostile work environment claims center around the following comments that Sundberg allegedly made: Sundberg called Plaintiff some iteration of "mamsy-pamsy," Sundberg said that Plaintiff was girly and thin-skinned, and Sundberg allegedly said that people over 30 who are unmarried are either crazy or gay. Dkt. 47 at 34 (citing PX A (1/30/23 Pl. Dep.) at 224:20-22, 237:13-14).

Beginning with the first allegation, Defendant argues that Sundberg called Plaintiff "namby-pamby" because Plaintiff was indecisive and incapable of decision-making on a particular contract for which Sundberg needed clear direction from Plaintiff. Dkt. 45 ¶ 42 (citing DX I (Sundberg Dep.) at 34:4-38:1, 53:5-54:15). Plaintiff, on the other hand, construed Sundberg's use of the term as "appear[ing] to stress the femininity of [Plaintiff] as if that were a negative characteristic." Dkt. 47 at 33. The Merriam-Webster Online dictionary defines the term "namby-

pamby" to mean (1) "lacking in character or substance: Insipid" or (2) "weak, indecisive." *Namby-pamby*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/namby-pamby#synonyms [https://perma.cc/767M-N7SK] (last visited June 19, 2023).[7]  Considering the facts in the light most favorable to Plaintiff, the Court finds that "namby-pamby" or "mamsy-pamsy" could be understood as a derogatory term that reflected Sundberg's perception of gay men as not being strong-willed or assertive enough to succeed in the workplace.  Sundberg calling Plaintiff too sensitive and girly could be perceived as offensive for that same reason, and Sundberg's comment about unmarried people over 30 being crazy or gay may evince some prejudice against homosexual people generally.  Thus, the Court finds that a reasonable juror could conclude that some of the harassment Plaintiff allegedly faced was based on his sexual orientation.

### b. Severity or Pervasiveness

The Court next addresses the severity or pervasiveness element of Plaintiff's hostile work environment claim.  The Fourth Circuit has instructed that employees "must clear a high bar in order to satisfy the severe or pervasive test." *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008).  Not all inadvisable or unprofessional workplace conduct is sanctionable. *Id.*  That is why it is this Court's task at summary judgment to "identify situations that a reasonable jury might find to be so out of the ordinary as to meet the severe or pervasive criterion." *Id.* at 316. When analyzing whether conduct qualifies as severe or pervasive, courts consider the totality of the circumstances, including the alleged conduct's (1) frequency; (2) severity; (3) whether the actions were physically threatening or humiliating; and (4) whether the conduct unreasonably

---

[7] Courts frequently rely on dictionaries to determine the plain meaning of words. *See, e.g.*, *United States v. Ward*, 982 F.3d 364, 370 (4th Cir. 2020) (relying on dictionary definitions).

interfered with the employee's work performance. *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001) (per curiam).  In short, Plaintiff must establish "that the environment was pervaded with discriminatory conduct 'aimed to humiliate, ridicule, or intimidate,' thereby creating an abusive atmosphere." *E.E.O.C. v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 176 (4th Cir. 2009) (quoting *Jennings v. U.N.C.*, 482 F.3d 686, 695 (4th Cir. 2007) (en banc)).  The Court again analyzes the alleged race-based conduct and sexual orientation-based conduct in turn.

i. Race-Based Conduct

In considering whether Sundberg's race-based harassment of Plaintiff was severe or pervasive, the Court first recognizes that the use of the n-word is "degrading and humiliating in the extreme." *Pryor v. United Air Lines, Inc.*, 791 F.3d 488, 497 (4th Cir. 2015) (citing *Walker v. Thompson*, 214 F.3d 615, 626 (5th Cir.2000)).  And as the Fourth Circuit has observed, "[p]erhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of . . . [the n-word] . . . ." *Spriggs*, 242 F.3d at 185 (quoting *Rodgers v. Western–Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir.1993)).  As such, Sundberg's use of the n-word during an Opportunity Meeting might well be enough, standing alone, to establish a hostile work environment, *see Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 280 (4th Cir. 2015) (en banc) (holding that even a single incident involving the use of certain racial epithets may be sufficiently severe to create a hostile work environment), but there was still more here.  Not only did Sundberg also allegedly make the racially derogatory "boy" and "gang" comments, but two witnesses other than Plaintiff noted that "there appear[ed] to be a systemic problem with discrimination within the Maximus leadership team."  PX Z (Ethics Invest. Rpt.) at 00363-64; *see also Spriggs*, 242 F.3d at 184 (noting that evidence of a general work atmosphere is relevant to the severe or pervasive inquiry).  The Court is therefore satisfied that a reasonable juror evaluating the

22

totality of the circumstances could find that Sundberg's race-based harassment of Plaintiff was severe or pervasive.

### ii. Sexual Orientation-Based Conduct

The Court finds that the sexual orientation-based harassment about which Plaintiff complains was much less severe than the alleged race-based conduct, however. Sundberg's comments merely constitute micro-aggressions—albeit ones that Plaintiff understandably took offense to. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (explaining that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment" (internal quotation marks and citation omitted)). Further, Plaintiff does not specify how frequently Sundberg called him "namby-pamby," too sensitive, or girly. Nor are there any witnesses who heard such language used generally in the workplace. *See* DX B (Patrick Dep.) at 85:13-86:13 (denying that she heard Sundberg make certain homophobic remarks); DX J (Willoughby Dep.) at 73:22-74:8 (same). Plaintiff's allegations about the sexual orientation-based harassment that he faced thus fall short of the severe or pervasive standard, and the sexual orientation-based hostile work environment claim in Count II of the Complaint thus fails on that ground.

### c. Imputation to Defendant

The Court next analyzes whether Sundberg's race-based harassment of Plaintiff can be imputed to Defendant. *Bratton*, 2022 WL 17336572, at *10. "Different standards exist for evaluating the conduct of a co-worker versus a supervisor." *Id.* Where a plaintiff is allegedly harassed by a supervisor, the employer may be held "either strictly or vicariously liable for the supervisor's actions." *Strothers*, 895 F.3d at 333 (citing *Vance*, 570 U.S. at 431). By contrast, where the alleged perpetrator is the plaintiff's co-worker, the employer may be held liable only if

it "knew or should have known about the harassment and failed to take effective action to stop it." *Id.*

In the instant case, the undisputed facts make clear that Sundberg was Plaintiff's co-worker, not his supervisor. An individual is considered a supervisor where the employer has empowered that employee to take tangible employment actions against the plaintiff, *i.e.*, to effect a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Vance v. Ball State Univ.*, 570 U.S. 421, 431 (2013). Here, evidence in the summary judgment record indicates that Plaintiff's team worked in tandem with Sundberg and his team, and that Plaintiff never reported directly to Sundberg. DX B (Patrick Dep.) at 75:8-9; DX H (Sundberg Decl.) ¶ 4; *see also* Dkt. 1 ¶ 17 (Plaintiff's Complaint alleging that Sundberg was his co-worker). Notably, Plaintiff merely asserts that Sundberg continuously *requested* that disciplinary action be taken against him, Dkt. 37 at 10 (citing PX C (Pl. Decl.)), not that Sundberg was in a position of power over Plaintiff such that he could discipline Plaintiff himself or direct someone else to discipline him.

Accordingly, the proper inquiry here is whether Defendant "knew or should have known about the harassment and failed to take effective action to stop it." *Strothers*, 895 F.3d at 333. Defendant does not dispute that it knew or should have known about Sundberg's conduct towards Plaintiff. Thus, the critical question is whether Defendant took effective action, "mean[ing] discipline that is reasonably calculated to end the behavior." *Bratton*, 2022 WL 17336572, at *11. As part of that analysis, courts "consider[] the promptness of the employer's investigation when complaints are made, whether offending employees were counseled or disciplined for their actions,

and whether the employer's response was actually effective." *E.E.O.C. v. Xerxes Corp.*, 639 F.3d 658, 669 (4th Cir. 2011).

The Court first finds that, considering the facts in the light most favorable to Plaintiff, Maximus' investigation into Sundberg's harassment of Plaintiff was not prompt. Indeed, Plaintiff avers that he complained to HR about Sundberg for the first time in January 2021, Dkt. 47 ¶¶ 40 (citing PX C (Pl. Decl.) ¶ 11), but it was only after Sundberg informed Iracheta of the allegations against him in March of that year that Iracheta initiated the HR Investigation, Dkt. 45 ¶ 44 (citing DX F (HR Invest. Summ.) at DEF 00378-79). Further, while Defendant argues that it took appropriate disciplinary action against Sundberg by transferring him to a different position and instructing him not to work with or interact with Plaintiff, Dkt. 45 at 28, Plaintiff correctly points out that this disciplinary action was not effective in the sense that Sundberg continued to attend the Opportunity Meetings, Dkt. 47 ¶ 73 (citing PX O (4/21/23 Pl. Dep.) at 164:18-165:2). For these reasons, the Court finds that Sundberg's conduct is imputable to Defendant. Accordingly, Plaintiff's race-based hostile work environment claims in Counts I and IV of the Complaint can proceed to trial.

### 3. The Constructive Discharge Claims

The Court next addresses Plaintiff's Title VII and Section 1981 constructive discharge claims (Counts I, II, and IV of the Complaint). For Plaintiff's constructive discharge claims to survive summary judgment, Plaintiff must show working conditions "so intolerable that a reasonable person in [his] position would have felt compelled to resign," and that "plaintiff actually resigned because of those conditions." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 211-12 (4th Cir. 2019). "Intolerability is not established by showing merely that a reasonable person, confronted with the same choices as the employee, would have viewed resignation as the wisest or best

decision, or even that the employee subjectively felt compelled to resign." *Id.* at 212 (internal quotation marks omitted).  Rather, "intolerability is assessed by the objective standard of whether a reasonable person in the employee's position would have felt compelled to resign." *Id.*  To prevail on summary judgment, Plaintiff must show that a reasonable person would have felt that he "had *no choice* but to resign." *Evans v. Int'l Paper Co.*, 936 F.3d 183, 193 (4th Cir. 2019) (quoting *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985)).  Importantly, "[t]he 'intolerability' standard governing constructive discharge claims is more stringent than the 'severe [or] pervasive' standard for hostile work environment claims." *Nnadozie v. Genesis HealthCare Corp., 730* F. App'x 151, 162 (4th Cir. 2018).

In support of his claims for constructive discharge, Plaintiff relies on the following set of allegations: Sundberg continued to attend Opportunity Meetings after the Reorganization and to humiliate Plaintiff in front of his colleagues; after learning of Plaintiff's internal complaint about him, Sundberg reached out to recruiters and told them to contact Plaintiff because he was in the market for a new job; and Sundberg at some point started a rumor that Plaintiff had been terminated from a previous place of employment.  Dkt. 47 at 37 (citing PX V (Richardson Document Production) at 201; PX N (Turner Decl.) ¶ 12).  Defendant, however, argues that, given the changes Maximus implemented after the completion of the HR and Ethics Investigations, Plaintiff's working conditions at the time of his resignation could not have been objectively intolerable.  Dkt. Nos. 45 at 29-31; 52 at 23-24.

The Court agrees with Defendant that Plaintiff's allegations do not meet the "objective intolerability" standard that governs the constructive discharge claims.  Plaintiff notified Defendant of his resignation on July 26, 2021, indicating that his final day of employment would be August 6, 2021.  DX S (Plaintiff's Resignation Email).  By the time of Plaintiff's resignation,

26

Plaintiff was no longer working alongside Sundberg on a daily basis.  DX M (Iracheta Dep.) at 34:10-35:5, 81:20-82:6; DX I (Sundberg, Dep.) at 23:18-24:4; DX H (Sundberg Decl. ¶¶ 1-2). Notably, while Plaintiff asserts that Sundberg continued to attend the Opportunity Meetings, Dkt. 47 ¶ 73 (citing PX O (4/21/23 Pl. Dep.) at 164:18-165:2), Plaintiff does not point to any specific instances of harassment that he was allegedly subjected to at those meetings, *id.* (averring that Sundberg continued to make disparaging comments about him after being transferred, without describing what those comments were (citing PX C (Pl. Decl.) ¶ 14)).  Such a conclusory assertion that he was subjected to "disparaging comments" does not clear the high bar of objective intolerability.  Dkt. 47 at 22; *see also Rucker v. Greenville Co. Sheriff Dep't.*, No. 10–1533, 2012 WL 951789, at *2 (D.S.C. March 20, 2012) (noting that "conclusory allegations . . . , without more, are insufficient to" defeat summary judgment).

Furthermore, it is unclear from the record whether Sundberg was still reaching out to recruiters or spreading a rumor about Plaintiff after his transfer to another position.  Regardless, even assuming that Plaintiff was subjected to this conduct just before resigning from Maximus, these allegations fall short of the objective intolerability standard.  Critically, the Fourth Circuit has found similar and even more extreme behavior to be insufficient to establish the kinds of working conditions necessary to prevail on a constructive discharge claim.  *See Alba v. Merrill Lynch & Co.¸*198 F. App'x 288, 294 (4th Cir. 2006) (holding that conditions that merely include unfair criticism and threats to force an employee to retire, "while difficult and stressful," could not "reasonably be described as intolerable); *Williams v. Giant Food, Inc.*, 370 F.3d 423, 434 (4th Cir. 2004) (concluding that allegations of being yelled at, called a poor manager, being forced to work with an injured back, and being chastised in front of customers were insufficient to establish constructive discharge).  This Court therefore finds that Plaintiff cannot proceed past the summary

judgment stage on his constructive discharge theory.  Accordingly, summary judgment in favor of Defendant is appropriate on the constructive discharge claims in Counts I, II, and IV of the Complaint.

### 4. The Retaliation Claims

The Court now turns to Plaintiff's retaliation claims.  Counts III and V of the Complaint allege that Maximus retaliated against Plaintiff for reporting the harassment he allegedly faced internally within Maximus.  In evaluating Plaintiff's retaliation claims under Title VII and Section 1981,[8] the Court employs the burden-shifting framework set forth in *McDonald Douglas Corp. v. Green*, 411 U.S. 792 (1973).[9]  Under that framework, Plaintiff must first establish a *prima facie* case of retaliation.  *Strothers v. City of Laurel, Md.*, 895 F.3d 317, 327 (4th Cir. 2018).  To do so, he must show: "(1) []he engaged in a protected activity; (2) the employer acted adversely against h[im]; and (3) there was a causal connection between the protected activity and the asserted adverse action."  *Id.* at 327-28 (citing *Ziskie v. Mineta*, 547 F.3d 220, 229 (4th Cir. 2008)).  If he makes that showing, the burden then shifts to Defendant, who must show that the "purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason."  *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015).  If Defendant meets its burden, then the burden returns to Plaintiff: he must "rebut [Defendant's] evidence by demonstrating that the employer's

---

[8] The standard for Title VII and Section 1981 retaliation claims is the same.  *See Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015) (explaining that a Section 1981 retaliation claim has the same elements as a Title VII retaliation claim).

[9] Alternatively, Plaintiff could have shown retaliation through direct evidence.  *Walton v. Harker*, 33 F.4th 165, 171 (4th Cir. 2022).  However, Plaintiff has not asserted that there is direct evidence supporting his retaliation claims; instead, he argues that he has met the requirements set forth by *McDonald Douglas*.  Dkt. 47 at 29, 39-40.

purported nonretaliatory reasons were not its true reasons, but were a pretext for discrimination." *Id.*

### a. Plaintiff's *Prima Facie* Case

The Court first examines whether Plaintiff has established a *prima facie* case of retaliation. Defendant does not appear to contest that Plaintiff engaged in a protected activity. And the undisputed facts that Plaintiff made internal complaints about Sundberg's alleged harassment of him and participated in two investigations into Sundberg's behavior confirm as much. Rather, Defendant argues that Plaintiff's *prima facie* case fails because the record is devoid of any evidence of Defendant (through either Sundberg or Maximus' corporate officers) taking any materially adverse actions against Plaintiff. Dkt. 45 at 33-37.

For Plaintiff to establish that he suffered an adverse action, he "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe R. R. Co. v. White*, 548 U.S. 53, 68 (2006). Adverse actions are not limited to "ultimate" employment decisions, such as an employer's decision to hire, fire, promote, or demote an employee. *Page v. Bolger*, 645 F.2d 227, 233 (4th Cir. 1981) (providing examples of ultimate employment decisions). Indeed, any employer actions that have a "significant detrimental effect" on an employee can constitute an adverse action. *Boone v. Goldin*, 178 F.3d 253, 256 (4th Cir. 1999). At bottom, any "acts or harassment [that] adversely [a]ffected the terms, conditions, or benefits of the plaintiff's employment" can be considered adverse actions. *Von Gunten v. Md.*, 243 F.3d 858, 865 (4th Cir. 2001) (cleaned up) *abrogated on other grounds by Burlington N.*, 548 U.S. 53.

Furthermore, an adverse action can consist of severe sanctions such as "termination, failure to promote, denial of transfer, or refusal to hire," *National R.R. Passenger Corp v. Morgan*, 536 U.S. 101, 110 (2002), or less drastic employment actions like "loss of job title or supervisory responsibility, or reduced opportunities for promotion," *Boone*, 178 F.3d at 255.  And retaliatory harassment can also constitute adverse employment action for purposes of a retaliation claim if that harassment is "so severe and pervasive to dissuade a reasonable worker from making or supporting a charge of discrimination engaging in a protective activity."  *Laurent Workman v. Wormuth*, 54 F.4th 201, 217 (4th Cir. 2022).

In the instant case, Plaintiff first asserts that Sundberg's increased hostility towards him after he found out that Plaintiff made a report about him to HR amounted to an adverse action. Dkt. 47 at 38.  In support of his argument, Plaintiff asserts that Sundberg threatened his continued employment at Maximus by reaching out to recruiters and telling them that Plaintiff was looking for a new job.  *Id.* at 38-39 (citing PX V (Richardson Document Production) at 201-02).  This Court finds, however, that threats of this nature fall short of the severe and pervasive conditions necessary to establish an adverse action.  *See Doe v. Cath. Relief Servs.*, 618 F. Supp. 3d 244 (D. Md. 2022) (HR officer's statement that, if employee continued pressing for dependent benefits for same-sex spouses, "things aren't going to turn out well" was insufficient to support employee's retaliation claim).

In addition to his allegations about Sundberg, Plaintiff alleges direct action by Defendant that he contends was retaliatory.  Specifically, Plaintiff claims that, as a result of his protected activities, (1) his most lucrative accounts, including ones with the Library of Congress, Department of Education, and the U.S. Courts, were taken from him, Dkt. 47 at 39 (citing PX C (Pl. Decl.)); (2) that he was reassigned to the Department of the Interior and the Department of Labor, *id.* (citing

PX CC (Pl. 568)); and (3) that he was stripped of his supervisory duties, *id.* at 24 (citing PX C (Pl. Decl.) ¶ 15).  With respect to Plaintiff's first two allegations, the crux of his grievance appears to be that, after the Reorganization, he was reassigned to work on potential contracting opportunities with government agencies other than those that he had previously been working with and would have to leave the accounts he had secured with other government agencies behind.  However, such a reassignment to a different business sector does not constitute an adverse action.  *See Rigg v. Urana*, 113 F. Supp. 3d 825, 829 (M.D. N.C. 2015) (a transfer was not materially adverse); *Mohammed v. Central Driving Mini Storage, Inc.*, 128 F. Supp. 3d 932, 950 (E.D. Va. 2015) (reassignment was not an actionable retaliatory act where there was no change in benefits, pay, or actual hours worked).  There is no evidence in the summary judgment record that the type of work Plaintiff was performing after the Reorganization changed.  Thus, though Plaintiff would be targeting different government agencies for contracting opportunities, that change does not appear to have been better or worse for Plaintiff.

A reasonable jury could, however, view Plaintiff's loss of supervisory responsibility as an adverse action.  While Defendant points to the various *reasons* why Plaintiff no longer had any subordinates shortly after the Reorganization—particularly that two of them requested to be transferred themselves and another two were merely interns working on a temporary basis, Dkt. 52 ¶ 83—that is not relevant to the adverse action inquiry.  Rather, these facts are critical as to whether there was a legitimate, non-retaliatory reason for the adverse action (which the Court will evaluate *infra*).  The Fourth Circuit has recognized the loss of supervisory responsibility as a quintessential adverse action, *Boone*, 178 F.3d at 255, and this Court finds no reason to divert from that principle here.

b. Legitimate, Non-Retaliatory Reasons for Adverse Actions

Nonetheless, the Court finds that Plaintiff's retaliation claims fail as a matter of law because Defendant has presented legitimate bases for any adverse actions. Even assuming *arguendo* that Plaintiff's reassignment and loss of accounts from his previous position were in fact adverse actions, Defendant has put forth evidence that Plaintiff's reassignment was part of a larger Reorganization within Maximus' Federal Segment. Dkt. 45 at 37 (citing DX E (Iracheta Decl. ¶ 12)). Specifically, Defendant explains that, after acquiring Attain in March 2021, Maximus realigned accounts in order to integrate Attain into the Maximus Federal Segment. *Id.* at 38.

Defendant has also adequately presented a non-retaliatory reason for Plaintiff's total loss of subordinates in the aftermath of the Reorganization. First, Defendant asserts that some of Plaintiff's subordinates left of their own volition. *Id.* According to Defendant, Bornarth, a business development manager who had reported to Plaintiff, requested a transfer to an opening on the financial services team under a different business development leader because she was not happy working for Plaintiff. *Id.* (citing DX F (HR Invest. Summ.) at DEF 000388-89). And another one of Plaintiff's subordinates, Murray, applied for and transferred to another team within Maximus. *Id.* Defendant also notes that the two interns who had reported to Plaintiff were both short-term interns who had left Maximus well before the reorganization. *Id.* (citing DX A (1/30/23 Pl. Dep.) at 176:5-11, 187:20-188:8).[10]

Critically, Plaintiff cannot show that Defendant's offered explanations are pretextual. In an attempt to rebut Defendant's claim that the reorganization was a legitimate change as a result

---

[10] Defendant additionally points out that Gary Kennedy actually *joined* Plaintiff's team as part of the Reorganization when Kennedy's team was disbanded. Dkt. 52 ¶ 83 (citing DX A (1/30/23 Pl. Dep.) at 298:9-18, 320:8-9, 16-17). Although Kennedy was eventually internally transferred again, this evidence does undermine Plaintiff's theory that the Reorganization was an elaborate plan to retaliate against him.

of an acquisition, Plaintiff makes a single argument—namely, that, after he was reassigned, "the work that [he] had been doing, still had to be done, it was just given to someone less qualified than Plaintiff"—Mike Owens, a recently promoted Business Manager.  Dkt. 47 at 40.  But that assertion does not show that Defendant's proffered reason is pretext.  Rather, it merely goes to whether Defendant's business decision of reassigning employees to various government agencies in a particular manner was a prudent one.

Ultimately, Defendant has set forth legitimate, non-retaliatory reasons for the actions that Plaintiff experienced, and Plaintiff has not sufficiently shown that those reasons are mere pretext.  Accordingly, Defendant is entitled to judgment as a matter of law on the retaliation claims (Counts III and V of the Complaint).

E. Conclusion

For the foregoing reasons, it is hereby ORDERED that Defendant's Motion to Strike (Dkt. 49) is GRANTED-IN-PART and DENIED-IN-PART and Defendant's Motion for Summary Judgment (Dkt. 43) is GRANTED-IN-PART and DENIED-IN-PART; and it is

FURTHER ORDERED that Counts VI, VII, and VIII of the Complaint are DISMISSED WITHOUT PREJUDICE to permit Plaintiff to properly exhaust those claims in accordance with Virginia law.

The Clerk is directed to enter judgment pursuant to Federal Rule of Civil Procedure 58 for Defendant as to Counts II, III, and V of the Complaint.  The Clerk is further directed to enter judgment for Defendant as to the constructive discharge claims in Counts I and IV of the

Complaint.  The race-based hostile work environment claims in Counts I and IV of the Complaint can proceed beyond the summary judgment stage.

It is SO ORDERED.

Alexandria, Virginia
July 21, 2023

/s/

Rossie D. Alston, Jr.
United States District Judge